UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CIENA CAPITAL LLC f/k/a | ) | |
| BUSINESS LOAN EXPRESS, LLC, et al., | ) | Case No. 08-13783 (AJG) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

## DISCLOSURE STATEMENT WITH RESPECT TO DEBTORS' THIRD AMENDED JOINT PLAN OF REORGANIZATION

Peter S. Partee
Andrew Kamensky (admitted *pro hac vice*)
Scott H. Bernstein
Jack A. Molenkamp
HUNTON & WILLIAMS LLP
200 Park Avenue, 53rd Floor
New York, New York 10166

Dated: September 2, 2010
     New York, New York

*Attorneys for Debtors and*
*  Debtors-in-Possession*

---

[1] The other Debtors are the following: Ciena Capital Funding, LLC f/k/a BLX Capital, LLC; BLX Commercial Capital, LLC; Business Loan Center, LLC; BLX Holdings Corp.; BLX Capital Real Estate, LLC; BLX Commercial Capital Real Estate, LLC; BLC Real Estate, LLC; BLX Capital Real Estate (Berlin), LLC; BLC Real Estate (UPC Petroleum), LLC; and BLC Real Estate (Texas), LLC.

<u>**IMPORTANT NOTICE**</u>

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE DEBTORS' THIRD AMENDED JOINT PLAN OF REORGANIZATION (THE "<u>PLAN</u>") AND MAY NOT BE RELIED UPON OR OTHERWISE USED FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON OR ENTITY MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ENTITLED TO VOTE ON THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS HERETO AND THERETO BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE DISCLOSURE STATEMENT AND THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN. THE TRANSMISSION OF THIS DISCLOSURE STATEMENT DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. AFTER THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL BE MATERIALLY ACCURATE, AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "<u>SEC</u>"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE HOLDERS OF IMPAIRED CLAIMS AGAINST THE DEBTORS WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) TO DETERMINE WHETHER TO ACCEPT OR REJECT THE PLAN. PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING, SECURITIES OF THE DEBTORS SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AND SHALL NOT BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, AS A STIPULATION OR AS A WAIVER, BUT RATHER, AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT IS NOT ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS

OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OR THE PLAN ON HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS.

**PARTIES SHOULD CONSULT WITH THEIR OWN COUNSEL, ACCOUNTANTS, AND/OR TAX ADVISORS WITH RESPECT TO THE LEGAL EFFECTS AND OTHER CONSEQUENCES OF THE PLAN.**

**TABLE OF CONTENTS**

I.      PURPOSE AND FUNCTION OF THIS DISCLOSURE STATEMENT...........................1

II.     OVERVIEW OF THE PLAN ......................................................................................2

III.    SOLICITATION AND VOTING PROCEDURES........................................................5
        A.      Chapter 11 Generally .........................................................................................5
        B.      Notice to Holders of Claims and Interests ........................................................6
        C.      Solicitation of Acceptances of the Plan ............................................................7
        D.      Voting on the Plan .............................................................................................8
        E.      Creditor Opt-Out Election.................................................................................10
        F.      Voting Procedures.............................................................................................11
        G.      Withdrawal of Votes on the Plan .....................................................................11
        H.      Other General Information................................................................................12

IV.     GENERAL BACKGROUND REGARDING THE DEBTORS ......................................13
        A.      The Debtors' Business and Corporate Structure.................................................13
        B.      Overview of the Events Leading to the Filing of the Debtors' Bankruptcy
                Petitions...........................................................................................................14
        C.      The Debtors' Capital Structure .........................................................................16
        D.      Description and History of the Chapter 11 Cases..................................................17

V.      SUMMARY OF THE DEBTORS' THIRD AMENDED JOINT PLAN OF
        REORGANIZATION ................................................................................................29
        A.      Classification and Treatment of Claims and Interests .......................................29
        B.      Disputed Claims ...............................................................................................35
        C.      Full Satisfaction, Discharge and Release ...........................................................35
        D.      Cancellation of Existing Agreements and Securities............................................35
        E.      Treatment of Executory Contracts and Unexpired Leases under the Plan ...........35
        F.      Means for Implementation of the Plan...............................................................37
        G.      Release, Injunctive and Related Provisions of the Plan........................................39
        H.      Plan Provisions Governing Distributions............................................................41
        I.      Conditions Precedent to Confirmation and Effective Date of the Plan ................45
        J.      Effects of Confirmation of the Plan ..................................................................46
        K.      Miscellaneous Provisions of the Plan ................................................................47
        L.      Retention of Jurisdiction ..................................................................................50

VI.     CONFIRMATION OF THE PLAN..............................................................................53
        A.      Confirmation Hearing .......................................................................................53
        B.      Statutory Requirements for Confirmation of the Plan .........................................53

VII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .................59
        A.      Federal Income Tax Consequences of the Plan to the Debtors .............................59

B.     Federal Income Tax Consequences of the Plan to Holders of Claims and Interests ........................................................................................................60

VIII.  CERTAIN RISK FACTORS AND OTHER CONSIDERATIONS ................................61
    A.     Failure to Receive Requisite Acceptances of the Plan...........................................61
    B.     Failure to Confirm the Plan....................................................................................62
    C.     Failure to Consummate the Plan .............................................................................62
    D.    Delays of Confirmation or the Effective Date .......................................................63
    E.     Ability to Service Debt ...........................................................................................63
    F.     Forward Looking Statements in this Disclosure Statement May Prove to be Inaccurate ........................................................................................................63

IX.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ......................................................................................................................64
    A.     Liquidation Under Chapter 7 of the Bankruptcy Code ..........................................64
    B.     Alternative Plan(s) of Reorganization ...................................................................64
    C.     Dismissal of the Chapter 11 Cases.........................................................................65

X.     CONCLUSION.....................................................................................................................65

**TABLE OF EXHIBITS**

Exhibit 1                Debtors' Third Amended Joint Plan of Reorganization

Exhibit 2                FCA Settlement Agreement

Exhibit 3                Release Agreement

Exhibit 4                SOL Waiver

Exhibit 5                SBA Settlement Agreement

Exhibit 6                Financial Projections

# I.  PURPOSE AND FUNCTION OF THIS DISCLOSURE STATEMENT

This Disclosure Statement (as it may be amended, modified and/or supplemented from time to time, the "Disclosure Statement") has been prepared pursuant to section 1125 of the Bankruptcy Code by Ciena Capital LLC f/k/a Business Loan Express, LLC ("Ciena") and certain of its direct and indirect subsidiaries, as debtors and debtors-in-possession in the above-captioned cases (together with Ciena, the "Debtors") in connection with the Debtors' solicitation of votes to accept the Debtors' Third Amended Joint Plan of Reorganization dated September 2, 2010 (as it may be amended, modified and/or supplemented from time to time, the "Plan"), a true and complete copy of which is annexed hereto as **Exhibit 1**.  **Terms herein with an initial capital letter not required by standard capitalization rules are defined terms, and each term used but not parenthetically or otherwise defined in this Disclosure Statement shall have the meanings ascribed to them in the Plan.**

The purpose of the Disclosure Statement is to set forth information:  (i) regarding the history of the Debtors and their businesses; (ii) describing the Debtors' chapter 11 cases (the "Chapter 11 Cases"); (iii) concerning the Plan and alternatives to the Plan; (iv) advising the Holders of Claims and Interests of their rights under the Plan; (v) assisting the Holders of Claims that are entitled to vote on the Plan in making an informed judgment regarding whether they should vote to accept or reject the Plan; and (vi) assisting the Holders of Claims in Classes 4, 5, 6 and 7 in making an informed judgment regarding whether they should exercise the Release Opt-Out Election.  The purpose of the Plan is to effect a restructuring of the Debtors' liabilities in a manner consistent with the Bankruptcy Code that will maximize recoveries by Creditors.

**FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY.**

This Disclosure Statement:

- Summarizes the Plan and the proposed treatment of Holders of Claims and Interests under the Plan (Section V.A, *Classification and Treatment of Claims and Interests*);

- Describes the procedures for soliciting, casting votes on and confirming the Plan (Section III, *Solicitation and Voting Procedures*);

- Describes the background and events leading to the Debtors' decision to commence the Chapter 11 Cases (Section IV, *General Background Regarding the Debtors*);

- Describes the Debtors' capital structure on the Petition Date (Section IV.C, *The Debtors' Capital Structure*);

- Describes how the Plan will be implemented (Section V.F, *Means for Implementation of the Plan*);

- Projects the total percentage recovery that each Class of Allowed Claims and Allowed Interests is likely to receive under the Plan (Section II, *Overview of the Plan*);

- Describes certain risk factors that may affect the feasibility of the Plan and potential distributions to Creditors (Section VIII, *Certain Risk Factors and Other Considerations*); and

- Evaluates the effects on Creditors of liquidation under Chapter 7 of the Bankruptcy Code as an alternative to the Plan (Section IX, *Alternatives to Confirmation and Consummation of the Plan*).

## II. <u>OVERVIEW OF THE PLAN</u>

Among other things, the Plan provides that:

- Each of the Settlements (*i.e.*, the SBA Settlement, the FCA Settlement and the Challenge Action Settlement) shall be consummated in accordance with the respective terms thereof, including the classification and treatment of the Allowed General Unsecured Claim granted under the FCA Settlement as an Allowed Class 4(a) Claim;

- The Revolving Credit Facility shall be closed and funded on the Effective Date;

- Holders of Unclassified Claims shall be paid in full in Cash;

- Holders of Allowed Priority Non-Tax Claims shall be paid in full in Cash;

- Holders of Allowed Class 1 Priority Non-Tax Claims shall be paid in full on the Effective Date or as soon thereafter as reasonably practicable thereafter, or otherwise shall be treated in a manner such that Class 1 is not Impaired;

- The Holder of the Allowed Class 2 Prepetition Secured Lender Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, (i) each of the promissory notes and related documents comprising the Restructured Credit Facility, and (ii) 100% of the Interests in the Reorganized Debtors;

- Each Holder of an Allowed Class 3 Other Secured Claim shall receive, on the Effective Date or as soon as reasonably practicable thereafter, a promissory note made by the applicable Debtor in the original principal amount equal to the amount of such Allowed Class 3 Other Secured Claim bearing interest at the higher of (i) the contractual rate and (ii) 6%, and payable in twelve (12) equal monthly installments commencing on the first Business Day of the first calendar month following the Effective Date;

- Holders of Allowed General Unsecured Claims in Classes 4, 5, 6, and 7 ***that do not*** exercise the Release Opt-Out Election shall receive, on the Effective Date or as soon as reasonably practicable thereafter, 100% of their Ratable Portion of the Unsecured Claimant Portion of the applicable Settlement Fund;

- Holders of Allowed General Unsecured Claims in Classes 4, 5, 6, and 7 ***that do*** exercise the Release Opt-Out Election shall receive on the Effective Date or as soon thereafter as reasonably practicable, 10% of their Ratable Portion of the Unsecured Claimant Portion of the applicable Settlement Fund;

- All Intercompany Claims among the Debtors shall be treated as Allowed Subordinated Claims in Class 8;

- All Allowed Class 8 Subordinated Claims shall be discharged in their entirety without the Holders of such Claims receiving or retaining any Cash, property or other distributions on account of such Claims; and

- All Allowed Class 9 Interests in the Debtors shall be indefeasibly cancelled and discharged without the Holders of Allowed Class 9 Interests in the Debtors receiving or retaining any Cash, property or other distribution on account of such Interests.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, including without limitation Professional Fee Claims, and Priority Tax Claims have not been classified under the Plan. Section V.A.1 of this Disclosure Statement below describes the treatment of Allowed Unclassified Claims. The following table briefly summarizes the treatment of Allowed Classified Claims and Allowed Interests.

| _**Class and Description**_ | _**Impairment and Entitlement to Vote**_ | _**Estimated Amount of Allowed Claims**_ | _**Estimated Recovery**_ |
|---|---|---|---|
| **Class 1** <br><br> Allowed Priority Non-Tax Claims | Unimpaired. Conclusively deemed to have accepted the Plan. Not Entitled to Vote. | $0 | 100% |
| **Class 2** <br><br> Allowed Prepetition Secured Lender Claim | Impaired. Entitled to vote. | $327,035,549.27 | Less than 25% |
| **Class 3** <br><br> Allowed Other Secured Claims | Impaired. Entitled to vote | $500,000.00 | 100% |

| Class and Description | Impairment and Entitlement to Vote | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|
| **Class 4(a)**<br><br>Allowed General Unsecured Claims against Business Loan Center, LLC, BLC Real Estate, LLC and BLC Real Estate (Texas), LLC as to which the Opt-Out Election _**has not**_ been made. | Impaired. Entitled to vote. | $21,960,245.00 | 50% |
| **Class 4(b)**<br><br>Allowed General Unsecured Claims against Business Loan Center, LLC, BLC Real Estate, LLC and BLC Real Estate (Texas), LLC as to which the Opt-Out Election _**has**_ been made. | Impaired. Entitled to vote. | $0 | 5% |
| **Class 5(a)**<br><br>Allowed General Unsecured Claims against Ciena Capital LLC and BLX Holdings Corp. as to which the Opt-Out Election _**has not**_ been made. | Impaired. Entitled to vote. | $6,570,188.00 | 50% |
| **Class 5(b)**<br><br>Allowed General Unsecured Claims against Ciena Capital LLC and BLX Holdings Corp. as to which the Opt-Out Election _**has**_ been made. | Impaired. Entitled to vote. | $0 | 5% |
| **Class 6(a)**<br><br>Allowed General Unsecured Claims against Ciena Capital Funding, LLC as to which the Opt-Out Election _**has not**_ been made. | Impaired. Entitled to vote. | $2,347,303.00 | 50% |

| Class and Description | Impairment and Entitlement to Vote | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|
| **Class 6(b)**<br><br>Allowed General Unsecured Claims against Ciena Capital Funding, LLC as to which the Opt-Out Election **_has_** been made. | Impaired. Entitled to vote. | $0 | 5% |
| **Class 7(a)**<br><br>Allowed General Unsecured Claims against BLX Commercial Capital, LLC as to which the Opt-Out Election **_has not_** been made. | Impaired. Entitled to vote. | $85,404.00 | 50% |
| **Class 7(b)**<br><br>Allowed General Unsecured Claims against BLX Commercial Capital, LLC as to which the Opt-Out Election **_has_** been made. | Impaired. Entitled to vote. | $0 | 5% |
| **Class 8**<br><br>Allowed Subordinated Claims | Impaired. Conclusively presumed to have rejected the Plan. Not Entitled to Vote. | $120,700,100.00 | 0% |
| **Class 9**<br><br>Allowed Interests in the Debtors | Impaired. Conclusively presumed to have rejected the Plan. Not Entitled to Vote. | N/A | 0% |

The Debtors' projected recoveries for Holders of Allowed Claims in the chart above is based on its estimate of the amount of Allowed Claims in each Class and the amount of Unclassified Claims. The Debtors' estimate of Allowed Claims results from its completion of the Claims reconciliation process except with respect to Rejection Claims filed as a result of the rejection of executory contracts under the Plan, as described in section V.E below.

## III. SOLICITATION AND VOTING PROCEDURES

### A. Chapter 11 Generally

Under chapter 11 of the Bankruptcy Code, a debtor reorganizes its business or sells its assets for the benefit of its creditors, interest holders (such as shareholders, partners or

members), and other parties in interest. The culmination of a chapter 11 case is the confirmation and consummation of a plan of reorganization, which specifies the treatment to be afforded to holders of claims against or interests in the debtor in exchange for the discharge and cancellation of such claims and interests. A plan of reorganization is implemented only after it has been confirmed by the bankruptcy court. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or interest holder of the debtor. Subject to certain limited exceptions, confirmation of the plan discharges the debtor from any debt that arose before the date of confirmation of the plan in exchange for the consideration specified under the confirmed plan. Thus, following confirmation, creditors and interest holders are deprived of their pre-bankruptcy rights and entitlements and instead are limited solely to the rights and entitlements specified by the plan.

In the Chapter 11 Cases, the Plan specifies the payments, distributions and other treatment to be afforded to Holders of Allowed Claims and Allowed Interests in the Debtors. Certain Holders of Allowed Claims, as specified in the Plan, are entitled to vote on the Plan. To confirm the Plan, certain voting requirements and statutory tests must be satisfied. The statutory tests are designed in large measure to protect the interests of Holders of Claims or Interests in the Debtors that either are not entitled to vote on the Plan or that vote to reject the Plan, but nevertheless will be bound by the provisions of the Plan if it is confirmed. For a more complete description of the requirements of such tests and how the Plan satisfies such tests, see Section VI.B of this Disclosure Statement.

## B.    Notice to Holders of Claims and Interests

This Disclosure Statement is being transmitted to Holders of certain Claims against and Interests in the Debtors. The primary purpose of this Disclosure Statement is to provide those Holders of Claims voting on the Plan with adequate information to make an informed decision on whether to vote to accept or reject the Plan.

On September 1, 2010, the Bankruptcy Court entered an order [Docket No. 1622] approving this Disclosure Statement, finding that it contains information of a kind and in sufficient detail to enable the Holders of Claims against the Debtors that are entitled to vote to make an informed judgment about the Plan.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN, NOR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE ANY DISTRIBUTIONS OF PROPERTY UNDER THE PLAN. THUS, YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY. IN PARTICULAR, HOLDERS OF IMPAIRED CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE EXHIBITS HERETO, THE PLAN, AND ANY EXHIBITS TO THE PLAN CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR TO REJECT THE PLAN.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, BY ITS NATURE, IS FORWARD LOOKING OR CONTAINS OR MAY CONTAIN ESTIMATES, ASSUMPTIONS AND/OR PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.

Except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur after the date hereof and that may have a material impact on the information contained in this Disclosure Statement. Further, the Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct or complete as of any time after the date hereof.

## C.      Solicitation of Acceptances of the Plan

Under the Plan, all Claims and Interests in the Debtors that are required to be designated in Classes pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code have been placed in various Classes based on the nature and priority of the Claims or Interests. Each Class is either Impaired or Unimpaired under the Plan. A Class of Claims or Interests that is Unimpaired is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, is not entitled to vote on the Plan. Similarly, a Class of Claims or Interests that does not receive or retain any property under the Plan is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, likewise, is not entitled to vote on the Plan. Accordingly, acceptances of the Plan are being solicited only from Holders of Claims in Classes 2, 3, 4, 5, 6 and 7, which are the only Impaired Classes that will receive distributions under the Plan. Holders of Claims in Class 1 are Unimpaired under the Plan, and therefore conclusively are presumed to have accepted the Plan. Holders of Allowed

Subordinated Claims in Class 8 and Holders of Allowed Interests in Class 9 will receive no distribution under the Plan and, therefore, are deemed to have rejected the Plan.

The Bankruptcy Code provides that a Class of Impaired Claims will have accepted the Plan if (i) Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code as described below) of at least two-thirds (2/3) in amount of Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. Pursuant to section 1126(c) of the Bankruptcy Code, a vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, after notice and a hearing, that such an acceptance or rejection of the Plan was not in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. For a more complete description of the requirements of confirmation of the Plan, see Section VI.B of this Disclosure Statement.

If a Class of Claims entitled to vote on the Plan does not accept the Plan, the Debtors reserve the right to amend the Plan or to request Confirmation of the Plan (or both) pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the rejection of the Plan by one more Impaired Classes of Claims. Under that section of the Bankruptcy Code, a plan may be confirmed by a bankruptcy court, if among other things, the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting Class. For a more complete description of the requirements of confirmation of a nonconsensual plan, see Section VI.B of this Disclosure Statement.

The Debtors are requesting Confirmation of the Plan with respect to Classes 8 and 9 pursuant to section 1129(b) of the Bankruptcy Code. In the event that a Class of Claims entitled to vote does not vote to accept the Plan, the Debtors' determination as to whether to request confirmation of the Plan with respect to such Class, pursuant to section 1129(b) of the Bankruptcy Code, will be announced at the Confirmation Hearing.

## D. <u>Voting on the Plan</u>

The Voting Deadline is October 25, 2010 at 5:00 p.m. (prevailing Eastern Time). To be counted for purposes of voting on the Plan, all of the information requested on the applicable Ballot must be provided. The Debtors reserve the right, in their sole discretion, and as permitted by the Bankruptcy Court, to extend the Voting Deadline, in which case the term "Voting Deadline" will mean the latest date and time on which a Ballot will be accepted. To the extent the Voting Deadline is extended by the Debtors, the Debtors will notify you of any extension by oral or written notice and as promptly as practicable mail written notice thereof to each record Holder of Claims entitled to vote. The notice may state that the Debtors are extending the Voting Deadline for a specified period of time or on a daily basis until 5:00 p.m. (prevailing Eastern Time) on the date on which the Debtors have received sufficient acceptances to seek Confirmation of the Plan.

If you are entitled to vote to accept or reject the Plan, enclosed is a Ballot for the acceptance or rejection of the Plan and a pre-addressed return envelope for the return of the Ballot.

> **BALLOTS FOR ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED ONLY TO HOLDERS OF IMPAIRED CLAIMS IN CLASSES 2, 3, 4, 5, 6 AND 7 BECAUSE THEY ARE THE ONLY HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.**

Please use only the official Ballot or Ballots that accompanies this Disclosure Statement. All votes to accept or reject the Plan must be cast by using that Ballot or Ballots. Votes that are cast in any manner other than on the designated Ballot will not be counted. Ballots must be actually received by Donlin, Recano & Company, Inc. (the "Voting Agent" or "Donlin"), at one of the addresses indicated on the Ballot, by no later than 5:00 p.m. (prevailing Eastern Time) on October 25, 2010. If you elect to vote on the Plan, you should complete and sign the Ballot in accordance with the instructions on the Ballot, and check the appropriate box entitled "Accept the Plan" or "Reject the Plan." You may not split your vote on the Plan with respect to a particular Class.

If you are the Holder of a Claim in Classes 2, 3, 4, 5, 6 and 7 and did not receive a Ballot, received a damaged or illegible Ballot or lost your Ballot, of if you are a party in interest and have any questions concerning this Disclosure Statement, the Plan or the voting procedures in respect thereof, please contact the Voting Agent at (212) 771-1128.

After carefully reviewing this Disclosure Statement, the Plan and the exhibits annexed hereto and thereto, please indicate on the enclosed Ballot your vote with respect to the Plan and, for Holders of Claims in Classes 4, 5, 6 and 7, whether you accept the Third-Party Releases set forth in section 10.1(b) of the Plan, and transmit the Ballot to the Voting Agent in accordance with either of the following two methods:

<u>**By Hand or Overnight Delivery**</u>:

Donlin, Recano & Company, Inc.
Re: Ciena Capital LLC
Attn: Voting Department
419 Park Avenue South, Suite 1206
New York, New York 10016

<u>**By Mail**</u>:

Donlin, Recano & Company, Inc.
Re: Ciena Capital LLC
Attn: Voting Department
P.O. Box 2034
Murray Hill Station
New York, New York 10156-0701

> **FAILURE TO COMPLY WITH THE REQUIREMENTS OF EITHER OF THESE METHODS MAY RESULT IN YOUR VOTE NOT BEING COUNTED. YOU MUST RETURN YOUR BALLOT TO THE VOTING AGENT BY THE VOTING DEADLINE.**
>
> **THE DEBTORS BELIEVE THAT PROMPT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR ESTATES AND ALL HOLDERS OF CLAIMS. THE DEBTORS STRONGLY URGE CREDITORS TO VOTE TO ACCEPT THE DEBTORS' PLAN.**

## E.     Creditor Opt-Out Election

Holders of Allowed General Unsecured Claims and Allowed Rejection Claims that are classified in Classes 4, 5, 6 and 7 will have the right to make the "Creditor Opt-Out Election." The Plan contemplates that all Holders of Allowed General Unsecured Claims and Allowed Rejection Claims in Classes 4, 5, 6 and 7 will be entitled to receive 100% of their Ratable Portion of certain recoveries being funded from the Settlement Funds in exchange for, among other things, granting the Third-Party Releases set forth in section 10.1(b) of the Plan. ***By making the Creditor Opt-Out Election, Holders of Allowed General Unsecured Claims and Allowed Rejection Claims are electing <u>NOT</u> to grant a release of all rights, claims or causes of action that arise as a result of, or are related to, such Holder's relationship with the Debtors or to the "Released Parties" and to <u>LIMIT</u> their recovery to 10% of the Ratable Portion of the distributions out of the Unsecured Claimant Portions of the Settlement Funds provided in the Plan for Holders of Allowed General Unsecured Claims and Allowed Rejection Claims in Classes 4, 5, 6 and 7. <u>HOLDERS OF GENERAL UNSECURED CLAIMS AND REJECTION CLAIMS THAT MAKE THE CREDITOR OPT-OUT ELECTION WILL RECEIVE JUST 10% OF THEIR RATABLE PORTION OF THE DISTRIBUTIONS OUT OF THE UNSECURED CLAIMANT PORTIONS OF THE SETTLEMENT FUNDS PROVIDED FOR UNDER THE PLAN.</u>*** To make the Creditor Opt-Out Election, Holders of Claims in Classes 4, 5, 6 and 7 must indicate their intent to make the Creditor Opt-Out Election in accordance with the instructions on the Ballot.

On the other hand, as consideration for not making the Creditor Opt-Out Election, the Holders of Allowed General Unsecured Claims and Allowed Rejection Claims in Classes 4, 5, 6 and 7 will have the right to receive 100% of the Ratable Portion of the distribution provided for under the Plan to members of those Classes. A full description of the treatment of Claims and Interests under the Plan is set forth in Section V.A below.

Notwithstanding the foregoing, the Allowed General Unsecured Claim granted under the FCA Settlement will be classified and treated as an Allowed Class 4(a) Claim in the amount of $10.1 million. That Claim will be voted by the SBA in accordance with the SBA Settlement Agreement.

If you have questions concerning the procedure for voting, the option to make the Creditor Opt-Out Election or the terms of this Disclosure Statement and/or the Plan, please contact counsel for the Debtors indicated on the first page of this Disclosure Statement. If you

did not receive the appropriate Ballot or Ballots, or if you received a damaged Ballot or have lost your Ballot, please contact the Voting Agent at (212) 771-1128.

### F.  Voting Procedures

Failure by a Holder of a Claim to deliver a duly signed Ballot will constitute an abstention by that Holder with respect to a vote on the Plan.  Abstentions will not be counted as either acceptances or rejections of the Plan.  Because abstentions will have no effect on voting with respect to the Plan, it is extremely important that you timely return your executed Ballot to indicate whether you accept or reject the Plan.  Any executed Ballots that are timely received but do not indicate either an acceptance or a rejection of the Plan or indicate both an acceptance and a rejection of the Plan will not be counted.

Submission of all Ballots must be made directly to the Voting Agent in accordance with the instructions on the Ballots.  In all cases, sufficient time should be allowed to assure timely delivery.  You may receive multiple solicitation packages.  You should only vote one Ballot for each Class of which you are a member.

### G.  Withdrawal of Votes on the Plan

The solicitation of acceptances of the Plan will expire on the Voting Deadline.  A properly submitted Ballot may be withdrawn by delivering a written notice of withdrawal to the Voting Agent at one of the addresses set forth on the Ballot at any time prior to the Voting Deadline.  Thereafter, withdrawal of a properly submitted Ballot may be effected only with the approval of the Bankruptcy Court, pursuant to Bankruptcy Rule 3018(a).

To be valid, a notice of withdrawal must:

- specify the name of the Claim Holder who submitted the vote on the Plan to be withdrawn;

- contain the description of the Claim; and

- be signed by the Claim Holder in the same manner as on the Ballot.

The Debtors expressly reserve the absolute right to contest the timeliness or validity of any withdrawals of votes on the Plan.

In addition to the withdrawal of a properly executed Ballot as specified above, any Claim Holder who has previously submitted a properly executed Ballot to the Voting Agent on or prior to the Voting Deadline, may revoke and change its vote by submitting to the Voting Agent on or prior to the Voting Deadline a subsequent properly executed Ballot.  If more than one properly executed Ballot is received from an individual Creditor with respect to the same Claim prior to the Voting Deadline, only the last properly executed Ballot received by the Voting Agent on or prior to the Voting Deadline will be deemed to reflect the Claim Holder's intent and will supersede and revoke all prior Ballot(s) submitted in connection with such Claim.

## H.    Other General Information

The Debtors believe that the Plan provides equal or greater value to Creditors than other available alternatives.  The Debtors believe that acceptance of the Plan is in the best interests of each and every Creditor entitled to vote on the Plan and recommends that each Creditor vote to accept the Plan.  This Disclosure Statement contains good faith estimates and assumptions which are based on facts currently known to the Debtors and which may be materially different from actual future results.

> **EACH CREDITOR SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY AND CONSULT WITH ITS LEGAL AND/OR BUSINESS ADVISORS AS IT DEEMS APPROPRIATE BEFORE VOTING ON THE PLAN.  THIS DISCLOSURE STATEMENT IS NOT LEGAL ADVICE TO YOU.  THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM ENTITLED TO VOTE THEREON, BUT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW.  THE DESCRIPTION OF THE PLAN HEREIN IS ONLY A SUMMARY, AND HOLDERS OF CLAIMS AND OTHER PARTIES IN INTEREST ARE CAUTIONED TO REVIEW THE PLAN THEMSELVES FOR A FULL UNDERSTANDING OF THE PLAN.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN WILL GOVERN.**

General information regarding the Debtors, their businesses and material events leading to the commencement of the Chapter 11 Cases and the history of the Chapter 11 Cases is set forth in Article IV hereof.  Except where otherwise noted, this information is provided by the Debtors and their management.  The statements as to the Debtors' financial condition contained in this Disclosure Statement are made as of July 30, 2010 (except as otherwise specified), and there is no representation or implication that the information contained herein will not have changed as of any time subsequent to that date, nor will you receive any notice of such changes.

Certain risk factors and other considerations are described in Article VIII below. Alternatives to confirmation and consummation of the Plan are described in Article IX below.

> **THIS DISCLOSURE STATEMENT INCLUDES CERTAIN STATEMENTS, ESTIMATES AND PROJECTIONS PROVIDED BY THE DEBTORS AS TO CERTAIN FUTURE MATTERS THAT REFLECT VARIOUS ASSUMPTIONS, WHICH ASSUMPTIONS MAY OR MAY NOT PROVE TO BE CORRECT.  THE DEBTORS DO NOT UNDERTAKE ANY OBLIGATION TO PROVIDE ADDITIONAL INFORMATION OR TO CORRECT OR UPDATE ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT OR THE EXHIBITS HERETO.**

# IV. GENERAL BACKGROUND REGARDING THE DEBTORS

## A. The Debtors' Business and Corporate Structure

Ciena is the parent company of each of the other Debtors. Ares Capital Corporation ("Ares Capital") (as successor by merger to Allied Capital Corporation ("Allied Capital")) owns approximately 95% of the Class C voting Interests in Ciena. The remaining Class C voting Interests in Ciena are owned by former officers of Ciena and their family members. Ares Capital owns 100% of the Class B Interests in Ciena. BBO Investments LLC (an affiliate of AllBridge, which is a portfolio company of Ares Capital) owns 100% of the Class A Interests in Ciena. Allied Capital acquired BLC Financial Services, Inc. ("BFLC"), in a going private transaction on December 31, 2000, and subsequently merged its small business lending company, Allied Capital SBLC, with BFLC to form Business Loan Express, Inc. ("BLX"). In February 2003, BLX converted from a corporation to a limited liability company. In January 2008, BLX changed its name to Ciena Capital LLC.

Since Ciena's wholly owned subsidiary Business Loan Center, LLC ("BLC") is a Small Business Lending Company ("SBLC"), it is regulated by the United States Small Business Administration ("SBA") under section 7(a) of the Small Business Act ("Act"), 15 U.S.C. § 631 *et seq*. *See* 13 C.F.R. § 120.470. Since 1994, the Debtors have originated and sold various small business loans that generally are secured by commercial real estate. Specifically, the Debtors originated three types of commercial loans: (1) loans ("SBA Loans") to small businesses that are guaranteed in part by the SBA under section 7(a) of the Act (the "SBA 7(a) Program"); (2) loans ("USDA Loans") to small businesses in rural communities that are guaranteed in part by the United States Department of Agriculture under the Rural Business-Cooperative Service's guaranteed loan program; and (3) conventional commercial real estate loans. Since their inception, the Debtors have made more than 9,000 SBA Loans totaling more than $3.4 billion, over 50 USDA Loans totaling more than $145 million, and more than 1,600 conventional commercial real estate loans totaling over $1.9 billion.

The SBA 7(a) Program is the principal loan program administered by the SBA. The core mission of the SBA 7(a) Program is to assist small businesses that are unable to receive conventional financing from commercial banks. Indeed, if an ordinary commercial lender is able to extend credit to a borrower, that borrower is by definition ineligible to participate in the SBA 7(a) Program. *See* 13 C.F.R. § 120.101; SBA SOP 50-10(4), Subpart A, Chapter 2, Sections 3 and 4. For each loan originated under the SBA 7(a) Program by a participating lender, the SBA conditionally agrees to guarantee a certain percentage of the loan (typically 75% in the event of default).

Because SBLCs, such as BLC, are non-depository institutions which must rely on funding sources other than deposits, the SBA 7(a) Program allows lenders to sell the guaranteed portions of the loans (typically 75%) in the secondary market and securitize the unguaranteed (typically 25%) portions of the loans. However, when SBLCs securitize and sell the unguaranteed portions of the loans, they must retain a significant financial risk in the unguaranteed pool of loans after the sale. Specifically, what occurs is that the SBLCs convey the unguaranteed portions of the loans to a trust; the trust pools the loans and sells different classes of bonds to investors based on the total amount of the loans in the trust. In accordance with SBA

regulations, the Debtors (through their indirect special purpose subsidiaries) were required to retain the lowest subordinated classes of bonds that the trust issues, placing them in the riskiest position. Therefore, when a loan defaults, the Debtors suffer a complete loss on their retained interests of the unguaranteed portion of the loan before any of the other bondholders.

Debtors Ciena Capital Funding, BLC, and BLX Commercial Capital, LLC each act as a servicer for loans that they originated. Specifically, Ciena Capital Funding acts as the servicer for a loan portfolio comprised of conventional commercial real estate loans, BLC acts as a servicer for a loan portfolio comprised of the SBA Loans, and BLX Commercial Capital, LLC acts as servicer for a loan portfolio comprised of USDA Loans. The Debtors hold interests in non-debtor subsidiary companies that hold residual interest securities in thirteen securitization trusts created by the Debtors in conjunction with various securitization transactions and two entities that acted as conduits for such transactions, none of which have filed for relief under the Bankruptcy Code. Those residual interests are valuable assets of the Estates and their preservation was one of the principal factors leading to the Debtors' decision to commence the Chapter 11 Cases.

BLX Holdings Corp. is not currently an operating entity. The remainder of the Debtors - BLX Capital Real Estate, LLC; BLX Commercial Capital Real Estate, LLC; BLC Real Estate, LLC; BLX Capital Real Estate (Berlin), LLC; BLC Real Estate (UPC Petroleum), LLC; and BLC Real Estate (Texas), LLC - are single purpose entities that hold REO property.

Before the onset of the severe economic downturn in the summer of 2007, the Debtors were one of the largest SBA lenders and had over 300 employees located in 50 offices across the country and a national network of business development officers and brokers originating loans. Although the Debtors continue to maintain their headquarters in New York, over the past two years, they have significantly reduced their employee base to approximately 40 people dedicated to loan servicing and administration in three operating offices who collectively service a portfolio of approximately $1.6 billion of outstanding principal amount of loans totaling approximately 3,200 in number.

**B.**    **Overview of the Events Leading to the Filing of the Debtors' Bankruptcy Petitions**

(i)    ***The Debtors' Inability to Finance New Loan Origination***

Historically, the Debtors relied on the asset-backed securitization market to finance their loan origination activity. As a result of the significant upheaval in the capital markets that started in the summer of 2007, during the last quarter of 2007 the Debtors ceased originating new loans because they were unable to sell those loans in the secondary market or through securitizations. The Debtors did not actively originate loans in 2008, although certain loans that were in process were funded. Prior to the commencement of the Chapter 11 Cases, the Debtors had been working to reposition their businesses. However, the persistent crisis in the capital markets and lack of available liquidity forced the Debtors to focus solely on servicing their existing loan portfolios and optimizing the value of those remaining loan assets and residual interests for the benefit of their creditors.

(ii)    ***The SBA Obligations***

In August 2006, the Debtors' Detroit office was closed.  In January 2007, a business development officer ("BDO") who previously was employed by the Debtors in their Detroit office was indicted by the office of the United States Attorney for the Eastern District of Michigan.  The indictment alleged that the former BDO was part of a conspiracy to fraudulently qualify loan applicants for SBA Loans.  Ultimately, the Debtors were a victim of a loan fraud scheme perpetrated by the BDO, to which he ultimately pled guilty.  Aside from the BDO, no other employee of the Debtors or their affiliates has been charged or indicted in connection with the alleged conspiracy.

Notwithstanding the fact that the problems were the result of a single, rogue former employee, in March 2007, Debtor BLC entered into that certain *U.S. Small Business Administration's Terms and Conditions for the Prevention of Losses Due to Fraud and for Certain Corrective Actions by Business Loan Express, Inc*. dated March 6, 2007 (the "March 6 Agreement") with the SBA as a condition to BLC continuing to be designated as a preferred lender under various SBA programs, which allowed BLC to continue to originate, sell and service SBA Loans through SBA's preferred lender program.  BLC agreed to repurchase certain defaulted guaranteed loans that were identified in the indictment before any adjudication of fraud, and immediately paid approximately $10 million to the SBA.  BLC also funded a $10 million escrow account for the benefit of the SBA to indemnify the SBA from future losses arising from prior fraudulent acts committed by any BLC employee or agent (the "Escrow Fund").  In addition to the $20 million expended in March 2007, BLC paid an additional $7 million to release the SBA of its guarantee obligations on loans related to certain SBA Loans originated out of the Debtors' Detroit office.

Under the terms of the March 6 Agreement, BLC agreed to have a fraud and operational review performed on certain SBA Loans originated during the term of the March 6 Agreement prior to the sale of the guaranteed portion.  In addition, BLC agreed to repurchase the guaranteed portion of certain SBA Loans that defaulted during the term of March 6 Agreement.  For any negative finding adopted by the SBA with respect to any SBA Loan originated during the term of the March 6 Agreement, the SBA was not obligated to reimburse BLC for BLC's repurchase of the guarantee.  In essence, the Debtors guaranteed the SBA Loans that defaulted until such time as the SBA determined that those loans were not fraudulently underwritten.  Another part of the March 6 Agreement required BLC to engage professionals to conduct an independent review of all SBA Loans before the guaranteed portion of any SBA Loan could be sold in the secondary market.  The costs and delays associated with those reviews resulted in the Debtors incurring significant additional carrying costs in connection with the SBA Loans that the Debtors intended to sell in the secondary market.

In April 2007, the Debtors sought authorization from the SBA to securitize the unguaranteed portions of the SBA Loans as part of their normal business operations.  The SBA did not grant authorization until August 2007.  By that time, the market for securitizing those types of loans had virtually ceased to exist.  The combination of the foregoing events served to significantly deplete the Debtors' liquidity to the point where it threatened their ability to operate.

The Debtors' relationship with the SBA became increasingly contentious as a result of the unworkable and disputed terms of the March 6 Agreement. As the SBA continued to make additional demands on the Debtors, the Debtors became concerned that the SBA might seek to exercise its rights to terminate BLC's right to service the portfolio of SBA Loans. BLC's right to service the portfolio of SBA Loans is a significant asset of the Debtors' estates, both as a stand-alone asset and because of their direct and material impact on the value of the underlying portfolio assets, including the residual interests in the various securitization trusts indirectly owned by the Debtors. A non-consensual termination of those servicing rights and transfer to a third-party would result in a loss of value of the Debtors' underlying portfolio assets. To avoid the potential for such a termination and to preserve the value of those rights and assets, the Debtors determined that it was necessary to commence these Chapter 11 Cases.

    (iii)    ***The Debtors' High Professionals' Fees and Expenses***

A direct consequence of the former BDO's actions is that the Debtors faced growing legal, accounting and other professional fees and expenses related to the various audits and investigations of their businesses, as well as various lawsuits related to or as a result of the indictment and subsequent conviction of the former BDO. In fact, the Debtors incurred approximately $7.5 million in professionals' fees and expenses in fiscal year 2008 and $15.4 million in professionals' fees and expenses in fiscal year 2007 in connection with the audits and investigations.

As a result of the Debtors' operational difficulties and the severe economic downturn that began in the summer of 2007, the Debtors concluded that the commencement of the Chapter 11 Cases was necessary to protect the value of the Debtors' businesses for the benefit of their creditors and shareholders. Accordingly, on September 30, 2008, the Debtors filed their respective Voluntary Petitions for relief under chapter 11 of the Bankruptcy Code.

**C.**     **The Debtors' Capital Structure**

Ciena is a party to that Second Amended and Restated Credit Agreement dated as of March 17, 2006 (as amended from time to time, the "Prepetition Credit Agreement") among Ciena as borrower, the other Debtors as subsidiary guarantors, Citibank, N.A., as administrative agent (the "Administrative Agent" or "Citibank") and certain lender parties thereto (the "Prepetition Secured Lenders"), pursuant to which the Prepetition Secured Lenders committed to provide Ciena with up to $500 million in revolving loans. Pursuant to certain security agreements and other documents entered into in conjunction with or related to the Prepetition Credit Agreement (collectively, the "Collateral Documents," and together with the Prepetition Credit Agreement and all other documents executed and delivered in connection with the foregoing, the "Prepetition Loan Documents"), the Debtors granted security interests in, and liens on, substantially all of their assets (the "Prepetition Collateral") to the Administrative Agent for the benefit of the Prepetition Secured Lenders. In addition, Allied Capital undertook obligations under standby letters of credit issued for the account of the Debtors in the amount of approximately $102 million as of the Petition Date.

As of the Petition Date, the Debtors were indebted to the Prepetition Secured Lenders in the aggregate principal amount of $324 million, plus accrued and unpaid interest thereon and

costs and expenses including without limitation attorneys' fees, the Administrative Agent's fees, other professionals' fees and disbursements and other obligations owing under the Prepetition Credit Agreement (the "Prepetition Secured Lender Claim").  The Debtors believe the current value of the collateral securing the indebtedness in connection with the Prepetition Secured Lender Claim is significantly below the amount of indebtedness.

In conjunction with the Debtors' execution of the Prepetition Loan Documents, Allied Capital entered into that certain Control Investor Guaranty Agreement (as amended from time to time, the "Guaranty") with the Prepetition Secured Lenders.  Pursuant to the Guaranty, Allied Capital guaranteed 50% of Ciena's indebtedness under the Prepetition Credit Agreement.  On September 26, 2007, as an inducement to the Prepetition Secured Lenders to amend the Prepetition Loan Documents, Allied Capital increased its guarantee to 60% of Ciena's indebtedness under the Prepetition Credit Agreement.  Thereafter, on January 30, 2008, Allied Capital agreed to guarantee all of the indebtedness under the Prepetition Credit Agreement because of the deterioration of the Debtors' financial conditions.

Contemporaneously with the commencement of the Chapter 11 Cases, Allied Capital honored its unconditional guaranty of the indebtedness under the Prepetition Credit Agreement by purchasing the outstanding interests from the vast majority of the Prepetition Secured Lenders.  From the Petition Date until on or about June 16, 2010, Citibank continued to serve as the Administrative Agent.  On or about June 16, 2010, Citibank exercised its right to put its interest in the Prepetition Credit Agreement to Ares Capital under that certain *Intercreditor and Override Agreement*, dated as of October 6, 2008, as amended, by and between Citibank and Ares Capital (the "Put") and agreed to resign as the Administrative Agent, subject to Ares Capital paying all obligations arising in connection with Citibank's exercise of the Put.  On or about June 16, 2010, Ares Capital became both the successor Administrative Agent under the Prepetition Credit Agreement and the sole Prepetition Secured Lender.

## D.    Description and History of the Chapter 11 Cases

### 1.    General Case Background

On the Petition Date, the Debtors voluntarily commenced the Chapter 11 Cases before the Bankruptcy Court.  The Debtors are continuing in possession of their properties and continuing to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors are authorized to operate in the ordinary course of business.  Transactions outside of the ordinary course of business must be approved by the Bankruptcy Court.

On October 2, 2008, the Bankruptcy Court entered an order [Docket No. 35] directing that the Chapter 11 Cases be procedurally consolidated and jointly administered for procedural purposes only under Case No. 08-13783.  The Honorable Arthur J. Gonzalez, Chief United States Bankruptcy Judge for the Southern District of New York, is presiding over the Chapter 11 Cases.

On October 8, 2008, the United States Trustee for the Southern District of New York, pursuant to its authority under section 1102 of the Bankruptcy Code, appointed [Docket No. 66]

the Official Committee of Unsecured Creditors (the "Committee") to serve in the Chapter 11 Cases. Since the appointment of the Committee, the Debtors have consulted with the Committee on all matters material to the administration of the Chapter 11 Cases. The Debtors also have discussed their business operations with the Committee and have sought the concurrence of the Committee for actions and transactions outside of the ordinary course of business.

The Committee originally consisted of three members:

1.      earthTouch, Inc.
        3135 North Fairfield Road - Suite D
        Layton, Utah 84041
        Attn:  Brett E. Cox, President

2.      RR Donnelley Global Real Estate Services
        3075 Highland Parkway
        Downers Grove, Illinois 60515
        Attn:  Dan Pevonka, Senior Credit Manager

3.      United States Small Business Administration
        409 Third Street, SW/8th
        Washington, D.C. 20416
        Attn:  Janet A. Tasker, Deputy Associate Administrator

The SBA subsequently withdrew and became an *ex officio* member of the Committee. Subsequently, the SBA resigned as an *ex officio* member of the Committee. No additional creditors have been appointed to the Committee. No other statutory committees have been designated or appointed in the Chapter 11 Cases.

2.      Entry of the First Day Orders

On October 3, 2008, October 21, 2008, October 23, 2008, and November 6, 2008, the Bankruptcy Court entered certain "first day" orders granting the Debtors various forms of relief designed to stabilize, and minimize any disruption to, the Debtors' business operations, including: (i) authorizing the continued maintenance of the Debtors' bank accounts, authorizing the continued use of the Debtors' prepetition cash management system, and continued use of the Debtors' existing business forms [Docket Nos. 40, 100], (ii) authorizing the Debtors to pay certain prepetition employee wage and benefit claims [Docket No. 41], (iii) prohibiting utilities from altering, refusing or discontinuing services to, or discriminating against, the Debtors on account of prepetition invoices, and establishing procedures for providing utilities with adequate assurance of future performance [Docket No. 109], and (iv) authorizing the Debtors to honor certain prepetition servicing and related obligations and to continue to perform servicing and related obligations in the ordinary course of business [Docket Nos. 42, 170].

Contemporaneously therewith, the Bankruptcy Court entered final orders (i) extending the time within which the Debtors may file their Statements of Financial Affairs and Schedules of Assets and Liabilities [Docket No. 102], (ii) approving interim compensation procedures for professionals employed by the Debtors and the Committee [Docket No. 108], and (iii) approving the form and manner of notice of the commencement of the Chapter 11 Cases, and authorizing

the filing of a consolidated list of the Debtors' top 30 unsecured creditors, and authorizing the preparation of a consolidated list of creditors in lieu of a mailing matrix [Docket No. 103].

3.      <u>Authorization to Use Cash Collateral and Debtor-in-Possession Financing</u>

Pursuant to the Collateral Documents, the Prepetition Secured Lenders assert security interests in, and liens on, substantially all of the Debtors' Assets, including what is termed "Cash Collateral" arising from those Assets. Cash Collateral includes all income, receivables, proceeds received from or on account of the Debtors' prepetition or postpetition business operations, and all other cash equivalents constituting Cash Collateral within the meaning of section 363(a) of the Bankruptcy Code. In order to avoid irreparable harm to the Debtors' businesses that would have occurred if the Debtors were unable to utilize Cash Collateral to support their operations, the Debtors filed a motion [Docket No. 16] (the "<u>Financing Motion</u>") on October 1, 2008, seeking, among other things, authorization to use the Cash Collateral to pay the Debtors' actual, necessary, ordinary course operating expenses and the expenses of the Chapter 11 Cases in accordance with a budget. On October 3, 2008, the Bankruptcy Court entered an order [Docket No. 43] on an interim basis allowing the Debtors to use Cash Collateral in accordance with a budget agreed upon with the Prepetition Secured Lenders.

On November 21, 2008, the Court entered the *Final Order Under 11 U.S.C. §§ 105, 361, 362, and 363(c) and Fed. R. Bankr. P. 2002, 4001 and 9014 Authorizing Debtors to Use Cash Collateral and Granting Adequate Protection to Prepetition Secured Parties* [Docket No. 228] (the "<u>Cash Collateral Order</u>"). The Cash Collateral Order included a budget (the "<u>Budget</u>"), which covered the period beginning October 1, 2008 and ending January 2, 2009. Beginning on January 6, 2009, the Prepetition Secured Lenders and the Debtors have extended the Cash Collateral Order and Budget by agreement [Docket Nos. 312, 429, 542, 677, 832, 935, 1051, 1191, 1323 and 1484] without prejudice to further extensions.

Also through the Financing Motion, the Debtors sought approval to enter into a postpetition debtor-in-possession financing facility (the "<u>DIP Financing Facility</u>") in an amount of up to $5 million with Allied Capital. After a hearing on October 2, 2008, the Court entered an interim order [Docket No. 43] on October 3, 2008 that, *inter alia*, authorized the Debtors to enter the DIP Financing Facility and to obtain loans on an interim basis in a principal amount not to exceed $2 million. On November 12, 2008, the Debtors withdrew without prejudice the portion of the Financing Motion seeking final authorization to enter into the DIP Financing Facility because the DIP Financing Facility was never drawn upon and the proceeds of the DIP Financing Facility were not required at that time.

4.      <u>Retention of the Professionals</u>

a.      <u>Hunton & Williams LLP</u>

To assist them in carrying out their duties as debtors-in-possession, and to represent their interests otherwise in the Chapter 11 Cases, the Debtors, on October 6, 2008, filed with the Bankruptcy Court an application [Docket No. 49] (the "<u>Hunton & Williams Application</u>") seeking entry of a final order authorizing the Debtors to retain Hunton & Williams LLP as their

lead counsel.  On October 21, 2008, the Bankruptcy Court entered a final order [Docket No. 98] approving the Hunton & Williams Application.

### b.      Bridge Associates, LLC

To assist them in carrying out their duties as debtors-in-possession, the Debtors, on October 2, 2008, filed with the Bankruptcy Court an application [Docket No. 22] (the "Bridge Application") seeking entry of a final order authorizing the Debtors to retain Bridge Associates, LLC ("Bridge Associates") as their financial advisors.  On October 21, 2008, the Bankruptcy Court entered a final order [Docket No. 99] approving the Bridge Application.

### c.      Donlin, Recano & Company, Inc.

On October 1, 2008, the Debtors filed with the Bankruptcy Court an application [Docket No. 15] (the "Donlin Application") seeking entry of a final order authorizing the Debtors to retain Donlin as their noticing, claims and Voting Agent.  On October 21, 2008, the Bankruptcy Court entered a final order [Docket No. 101] approving the Donlin Application.

### d.      HLB Gross Collins, P.C.

On July 6, 2009, the Debtors filed with the Bankruptcy Court an application [Docket No. 689] (the "HLB Gross Collins Application") seeking entry of a final order authorizing the Debtors to retain HLB Gross Collins, P.C. as their accountants and auditors.  On July 20, 2009, the Bankruptcy Court entered a final order [Docket No. 739] approving the HLB Gross Collins Application.

### e.      Ordinary Course Professionals

On October 2, 2008, the Debtors filed with the Bankruptcy Court a motion [Docket No. 23] (the "Ordinary Course Professional Motion") seeking entry of a final order authorizing the Debtors to employ numerous professionals, utilized in the ordinary course, to assist the Debtors in their day-to-day business operations (the "Ordinary Course Professionals") without having to file formal retention applications.  On October 22, 2008, the Bankruptcy Court entered a final order [Docket No. 105] approving the Ordinary Course Professional Motion.  Each Ordinary Course Professional is assigned a monthly maximum amount (either $25,000 or $50,000 per month) that it may be paid without seeking approval of the Bankruptcy Court.

### f.      Hahn & Hessen LLP

On October 23, 2008, the Committee filed with the Bankruptcy Court an application [Docket No. 114] (the "Hahn & Hessen Application") seeking entry of a final order authorizing the Committee to employ Hahn & Hessen LLP as counsel to the Committee *nunc pro tunc* to October 8, 2008.  On November 5, 2008, the Bankruptcy Court entered a final order [Docket No. 169] approving the Hahn & Hessen Application.

###### g. J.H. Cohn LLP

On October 23, 2008, the Committee filed with the Bankruptcy Court an application [Docket No. 113] (the "J.H. Cohn Application") seeking entry of a final order authorizing the Committee to employ J.H. Cohn LLP as its financial advisors and forensic accountants *nunc pro tunc* to October 8. 2008. On November 5, 2008, the Bankruptcy Court entered a final order [Docket No. 168] approving the J.H. Cohn Application.

###### h. Wilmer Cutler Pickering Hale and Dorr LLP

On November 3, 2008, the Debtors filed with the Bankruptcy Court an application [Docket No. 155] (the "Wilmer Cutler Application") seeking entry of a final order authorizing the Debtors to retain Wilmer Cutler Pickering Hale and Dorr LLP as special counsel to the Debtors in certain investigatory and False Claim Act matters *nunc pro tunc* to the Petition Date. On November 26, 2008, the Bankruptcy Court entered a final order [Docket No. 244] approving the Wilmer Cutler Application.

###### i. Morris, Nichols, Arsht & Tunnell LLP

On November 13, 2009, the Debtors filed with the Bankruptcy Court an application [Docket No. 947] (the "Morris Nichols Application") seeking entry of a final order authorizing the Debtors to retain Morris, Nichols, Arsht & Tunnell LLP as conflicts counsel for the Debtors *nunc pro tunc* to October 6, 2009. On December 2, 2009, the Bankruptcy Court entered a final order [Docket No. 974] approving the Morris Nichols Application.

##### 5. Claims Process and Bar Date

On December 10, 2008, the Bankruptcy Court entered the *Order (A) Establishing Bar Dates for Filing Proofs of Claim, (B) Approving the Bar Date Notice and the Form and Manner of Notice Thereof, and (C) Authorizing the Debtors to Provide Notice of the Bar Dates* [Docket No. 267] (the "Bar Date Order"). The Bar Date Order established January 21, 2009 as the deadline for all Persons other than Governmental Units to file Proofs of Claim in the Chapter 11 Cases (the "General Bar Date"). Subject to certain limited exceptions contained in the Bankruptcy Code and in the Bar Date Order (including with respect to Rejection Claims arising from the rejection of executory contracts after the General Bar Date), all Proofs of Claim filed against the Debtors by Persons other than Governmental Units were required to be filed by the General Bar Date. The Bar Date Order established March 30, 2009 as the Governmental Units Claims Bar Date. Both the General Bar Date and the Governmental Units Claims Bar Date remain in full effect and have not been modified; provided, however, the Governmental Unit Claims Bar Date has been extended for the United States and for the SBA in connection with the FCA Settlement and the SBA Settlement, respectively.

As of July 30, 2010, 668 Proofs of Claim were filed against the Debtors. Through the filing and prosecution of eleven omnibus objections to Claims [Docket Nos. 450, 533, 633, 762, 868, 1039, 1058, 1059, 1062, 1063, 1286] a number of specific objections to Claims [Docket Nos. 866, 991, 994, 1070], as well as by means of amendments to their Schedules, the Debtors have finalized the amount of Allowed Claims in each Class and the amount of Allowed Unclassified Claims, except for Rejection Claims with respect to executory contracts to be

rejected under the Plan as specified in the Rejection Schedule. As described in section V.E. below, the Debtors do not believe there will be any material Allowed Rejection Claims arising as a result of the executory contracts to be rejected under the Plan. To the extent any Proofs of Claim for Rejection Claims are filed as a result of the rejection of executory contracts under the Plan, the Debtors will diligently pursue the claims reconciliation process with respect to such Proofs of Claim, including the filing of any objections as may be appropriate, after the Effective Date in accordance with Article VII of the Plan.

No order has been entered establishing a bar date for filing Administrative Claims. The Debtors have generally been paying undisputed Administrative Claims in the ordinary course of business post-Petition Date.

> **UNDER THE PLAN, THE BAR DATE FOR FILING ADMINISTRATIVE CLAIMS, INCLUDING CLAIMS FOR PROFESSIONAL FEES, IS THE FIRST BUSINESS DAY THAT IS THIRTY (30) CALENDAR DAYS AFTER THE EFFECTIVE DATE OF THE PLAN.**

6.      Rejection of Leases and Executory Contracts

The Debtors have filed five omnibus motions seeking authority to reject certain non-residential real property leases, equipment leases and/or executory contracts in order to avoid burdening the Debtors' Estates with any unnecessary postpetition obligations [Docket Nos. 221, 303, 350, 587, and 755]. The Bankruptcy Court has entered orders approving each of the Debtors' omnibus motions to reject certain non-residential real estate leases and executory contracts [Docket Nos. 270, 286, 376, 391, 614 and 785] (collectively, the "Rejection Orders"). Pursuant to the Rejection Orders, the Debtors have rejected approximately sixty-five leases and executory contracts.

On December 18, 2008, the Debtors filed a motion [Docket No. 282] (the "SBA Rejection Motion") seeking entry of an order rejecting the March 6 Agreement. The Debtors filed the motion because they were concerned that the SBA might assert pre-termination Administrative Claims against the Debtors' Estates. At a hearing on the Motion, the SBA stated that it did not plan to assert any pre-termination Administrative Claims against the Debtors' Estates. On January 29, 2009, the Bankruptcy Court entered a minute order [Docket No. 380] denying the relief sought in the SBA Rejection Motion as moot.

> **UNDER THE PLAN, THE REJECTION CLAIMS BAR DATE IS THE LATER OF (i) THE FIRST BUSINESS DAY THAT IS THIRTY (30) CALENDAR DAYS AFTER THE CONFIRMATION DATE AND (ii) THE FIRST BUSINESS DAY THAT IS THIRTY (30) CALENDAR DAYS AFTER THE BANKRUPTCY COURT ENTERS AN ORDER APPROVING THE REJECTION OF THE EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT GIVES RISE TO THE REJECTION CLAIM.**

7.    The Challenge Action and the Settlement Thereof

The Cash Collateral Order provides, *inter alia*, (a) the Debtors' stipulation that the Prepetition Secured Lenders were granted valid, binding, perfected, enforceable, first priority liens upon, and security interests in the Prepetition Collateral, and (b) the Debtors' stipulation would be binding on all parties in interest in the Chapter 11 Cases, including the Committee and the SBA, unless a party challenged the amount, validity, enforceability, priority or extent of the indebtedness under the Prepetition Credit Agreement or the Prepetition Secured Lenders security interest in, and liens upon, the Prepetition Collateral on or before February 1, 2009 (the "Challenge Action Deadline"). The Challenge Action Deadline also applies to any and all Claims and Causes of Action that any parties may seek to assert against the Prepetition Secured Lenders on behalf of the Debtors' Estates. In addition, the Cash Collateral Order provided that the Prepetition Secured Lenders were not granted an adequate protection replacement security interest in, and lien upon, any interests, rights, obligations, licenses or proceeds of the SBA Loans originated under the SBA 7(a) Program that are owned by the Debtors unless the Bankruptcy Court found that such interests, rights, obligations, licenses or proceeds could lawfully be pledged as collateral without the written consent of the SBA. Ares Capital and Citibank disputed that the SBA has standing to assert any claims or cause of actions against the Prepetition Secured Lenders.

On January 28, 2009, the Committee and the SBA commenced an adversary proceeding (the "Adversary Proceeding") by filing an adversary proceeding complaint [Adv. Pro. No. 09-01025, Adv. Pro. Docket No. 1] (the "Adversary Proceeding Complaint") against Citibank in its capacity as Administrative Agent and Prepetition Secured Lender, and Allied Capital in its capacity as a Prepetition Secured Lender. Through the Adversary Proceeding Complaint, the Committee and the SBA requested that the Bankruptcy Court find that the Prepetition Secured Lenders and the Administrative Agent do not have security interests and liens upon the proceeds of the SBA Loans originated under the SBA 7(a) Program. The Debtors understand that the Committee and the SBA considered whether to bring additional claims and causes of action against the Prepetition Secured Lenders.

Beginning on February 3, 2009, the Bankruptcy Court has entered a series of orders [Docket Nos. 389, 432, 512, 576, 722, 803, 895, 946, 1020, 1103 and 1195] extending the Challenge Action Deadline only for the Committee and, if applicable, the SBA from the earlier of July 1, 2010 or the Effective Date of the Plan, without prejudice to the rights of any party with respect to the issue of whether the SBA has standing to assert any claims or causes of action against the Prepetition Secured Lenders.

Allied Capital, Citibank, the Debtors, the Committee, the United States Department of Justice and the SBA engaged in informal and formal discovery proceedings and settlement discussions. On March 17 and 18, 2009, Allied Capital, the Debtors, the Committee, the United States Department of Justice and the SBA attended a voluntary mediation in Washington, D.C. in an effort to resolve their disputes relating to the Adversary Proceeding with respect to the claims asserted solely by the SBA and certain other issues, including certain claims not held by the Debtors' Estates that may be the subject of an action between such parties and relating to the Chapter 11 Cases.

Although no settlement agreement was executed during the mediation session in Washington, D.C., the parties continued to document a settlement agreement following the mediation. Those discussions culminated in the Settlement Agreement dated June 16, 2010 (the "Challenge Action Settlement Agreement"). The Challenge Action Settlement Agreement was the result of lengthy and good faith negotiations among all parties, conducted at arm's-length over a period of approximately 15 months. In structuring the Challenge Action Settlement Agreement, the parties sought to achieve the following objectives:

- resolution of the potentially expensive and protracted litigation among the SBA, the Committee, and Ares Capital in its capacity as the sole Prepetition Secured Lender and the Administrative Agent;

- minimizing ongoing expenditures out of the Debtors' estates, including administrative expense expenditures; and

- establishing the conditions that would permit the Debtors to file and obtain approval of the Plan, including the distributions that are provided for therein to Holders of Allowed General Unsecured Claims.

The Challenge Action Settlement Agreement, was submitted for approval pursuant to a joint motion [Docket No. 1411] submitted by the Debtors and the Committee on June 16, 2010, and approved by the Bankruptcy Court after notice and a hearing on June 30, 2010, includes the following key elements, subject to the occurrence of the Effective Date for the Plan:

- Ares Capital's Release of Liens Upon and Security Interests in the Prepetition Collateral and Funding of Plan: Ares Capital, as the Administrative Agent and the Prepetition Secured Lender, relinquished and waived its liens upon and security interests in the Prepetition Collateral by the amount of the settlement payments provided for in the Challenge Action Settlement Agreement and reduced the amount of its Prepetition Secured Lender Claim by the same amount. The effect of this release is to provide on the Effective Date for (i) an immediate payment of all Allowed Administrative Claims, Allowed Priority Claims and Allowed Secured Claims (other than the Prepetition Secured Lender Claim held by Ares Capital in its capacity as the sole Prepetition Secured Lender), and (ii) the funding of Settlement Funds that will provide for a projected fifty percent (50%) recovery on non-insider General Unsecured Claims asserted against the estates of Ciena Capital, LLC, BLX Holdings Corp., Business Loan Center, LLC, BLX Commercial Capital, LLC and Ciena Capital Funding, LLC, exclusive and apart from funding a settlement of all claims asserted or that could be asserted by the SBA (who purports to hold claims against the Debtors in excess of $100 million) and the United States of America;

- Ares Capital's Subordination of Its General Unsecured Claims: Ares Capital in its capacity as the Prepetition Secured Lender has agreed to subordinate its General Unsecured Claims in the approximate aggregate amount of $120 million filed by Ares Capital to the other General Unsecured Claims of the Debtors' Estates with respect to the settlement payments made under the Challenge Action Settlement Agreement and to not share in any of the distributions of such settlement payments;

- Ares Capital's Support of Confirmation of Plan: To the extent eligible to vote on the Plan in its capacity as the Prepetition Secured Lender, Ares Capital agreed to cast a Ballot accepting the Plan and otherwise agrees to support confirmation of the Plan;

- Claim Election: Ares Capital in its capacity as Prepetition Secured Lender elected pursuant to section 1111(b)(2) of the Bankruptcy Code to have an Allowed Prepetition Secured Lender Claim in the amount of $327,038,549.27 exclusive of accrued but unpaid default rate interest, costs, fees and expenses; and

- Release of Ares Capital: The Debtors, the SBA and the Committee, on behalf of the Debtors' Estates, will fully and forever release and discharge Ares Capital in its capacity as the Administrative Agent and as the Prepetition Secured Lender from any and all claims and causes of action.

8.      The Litigation with Credit Suisse Securities (USA) LLC

On December 22, 2009, the Debtors commenced an adversary proceeding, bearing the caption *Ciena Capital LLC f/k/a Business Loan Express, LLC v. Credit Suisse Securities (USA) LLC*, by filing an adversary proceeding complaint [Adv. Pro. No. 09-01931; Adv. Pro. Docket No. 1] (the "Credit Suisse Adversary Proceeding Complaint") against Credit Suisse Securities (USA) LLC ("Credit Suisse") in the Bankruptcy Court. Through the Credit Suisse Adversary Proceeding Complaint, the Debtors sought to avoid and recover two prepetition transfers in the approximate amount of $7,000,000 (the "Transfers") that were made by Ciena, on behalf of Ciena Capital Funding, to Credit Suisse on the basis that the Transfers constituted fraudulent transfers under the Bankruptcy Code and New York Debtor and Creditor Law. In addition, through the Credit Suisse Adversary Proceeding Complaint, the Debtors sought the entry of an order, in the absence of the return of the Transfers, disallowing a certain proof of claim filed by Credit Suisse in its individual capacity and on behalf of Wachovia Capital Markets, LLC asserting a general unsecured claim against Ciena Capital Funding in an amount not less than $21,062,657.66 (the "Credit Suisse Proof of Claim") arising from Ciena Capital Funding's alleged breach of a certain note purchase agreement.

After the Bankruptcy Court heard oral argument on Credit Suisse's motion to dismiss the Credit Suisse Adversary Proceeding Complaint and related pleadings [Adv. Pro. No. 09-01931; Adv. Pro. Docket Nos. 7, 8, 13 and 15] and during the pendency of Credit Suisse's objection [Docket No. 1365] (the "Credit Suisse Objection") to the Debtors' request that the Bankruptcy Court approve the SBA Settlement Agreement and the FCA Settlement Agreement, the Debtors and Credit Suisse engaged in extensive, good faith, and arm's-length settlement discussions. As a result of these settlement discussions, the Debtors and Credit Suisse entered into a global settlement agreement embodied in a stipulation and order [Docket No. Adv. Pro. No. 09-01931; Adv. Pro. Docket No. 17] (the "Credit Suisse Settlement Agreement"). Pursuant to the terms of the Credit Suisse Settlement Agreement, the Debtors and Credit Suisse agreed, *inter alia*, (i) Credit Suisse would support confirmation of the Plan, vote its Ballot to accept the Plan and accept the releases and exculpations contained in the Plan, (ii) the Credit Suisse Adversary Proceeding Complaint would be dismissed with prejudice with each party bearing its own costs and attorneys' fees, (iii) Credit Suisse would withdraw the Credit Suisse Objection, and (iv) subject to certain conditions contained in the Settlement Agreement, the Credit Suisse Proof of

Claim would be allowed as an Allowed General Unsecured Claim against the bankruptcy estate of Ciena Capital Funding in the amount of $2,000,000.

9.      The 341 Meeting

On December 15, 2008, the United States Trustee convened a meeting of creditors (the "341 Meeting") pursuant to section 341(a) of the Bankruptcy Code. Louis Hafkin, Executive Vice President and Director of Operations of Ciena, attended the 341 Meeting on behalf of the Debtors. The 341 Meeting was closed on December 15, 2008, with the exception of allowing the 341 Meeting to be reconvened for the limited purpose of allowing the SBA to ask questions about certain specified topics.

10.     Extensions of Exclusivity

The Bankruptcy Code grants a debtor an initial period of 120 days after the commencement of the chapter 11 case during which the debtor has an exclusive right to propose and file a plan of reorganization (the "Exclusive Filing Period"). If the debtor proposes and files a plan within the initial 120-day Exclusive Filing Period, then the debtor has until the end of the period ending on the 180th day after the commencement of the chapter 11 case to solicit and to obtain acceptances of such plan (the "Exclusive Solicitation Period," and together with the Exclusive Filing Period, the "Exclusive Periods"). The Exclusive Periods may be extended by an order of the Bankruptcy Court. Beginning on January 21, 2009, the Bankruptcy Court has entered a series of orders [Docket Nos. 377, 537, 813 and 1012], without prejudice to the right of the Debtors to seek further extensions, extending the Debtors' Exclusive Filing Period through and including March 30, 2010, and extending the Debtors' Exclusive Solicitation Period through and including May 30, 2010.

11.     The FCA Litigation and the Settlement Thereof

a.      The FCA Litigation

On December 28, 2004, James R. Brickman ("Brickman") and Greenlight Capital Inc. ("Greenlight," and together with Brickman, the "Relators") filed a *qui tam* action under seal in the United States District Court for the Northern District of Georgia (the "District Court"), captioned *United States ex rel. Brickman, et al. v. Business Loan Express, et al.*, No. 04 Civ. 3789, against Ciena, Allied Capital, the Individual Defendants, and "Does 1-100" (the "FCA Litigation"). The Relators' complaint alleged that Ciena and the other named defendants engaged in loan origination fraud, committing the SBA to guarantee loans that, under SBA rules, regulations and policies, and prudent lending practices, should not have been guaranteed, thereby violating the False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA"). Furthermore, the Relators alleged that Ciena was the alter ego of Allied Capital.

Under the FCA, the United States had the right to intervene and become the plaintiff in the FCA Litigation. Throughout negotiations to settle the FCA Litigation, the United States took the position that absent a settlement of the FCA Litigation, it would seek authority to intervene and assert civil claims under the False Claims Act against Ciena for engaging in the following conduct during the period 1999 to 2008 (the "Covered Conduct"): (i) deficient origination, underwriting, issuing, processing and servicing of SBA "PLP" loans issued by Ciena that

defaulted within 20 months after disbursement and (ii) deficient origination, underwriting, issuing, processing and servicing of loans that were the subject of a guilty plea entered into by former BLC Executive Vice President Patrick Harrington or that were made by the office that Harrington managed during the time he was employed by Ciena.

The United States also asserted that it had certain civil claims against Allied Capital arising solely from Allied Capital's ownership interest in Ciena and Ciena's alleged participation in the Covered Conduct.

Ciena, Allied Capital, and the Individual Defendants vigorously disputed all claims asserted by the Relators and all claims asserted by the United States with respect to the Covered Conduct and Ciena's alleged participation in the Covered Conduct.

The Relators claimed entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of any settlement of the FCA Litigation, including consideration paid under the FCA Settlement Agreement that is related to the Covered Conduct. In addition, pursuant to 31 U.S.C. § 3730(d), the Relators claimed entitlement to reimbursement of certain expenses, fees and costs from the defendants in the FCA Litigation.

b.    Settlement of the FCA Litigation

Between March 30, 2010 and April 6, 2010, the United States of America (the "United States"), acting through the United States Department of Justice and on behalf of the SBA, the Debtors, Ares Capital, certain former and current employees of Ciena, and a certain former employee of Allied Capital entered into a settlement agreement (the "FCA Settlement Agreement"), a true and complete copy of which is annexed hereto as **Exhibit 2**, subject to approval of the Bankruptcy Court. The FCA Settlement Agreements—comprised of the FCA Settlement Agreement, the Release Agreement (annexed hereto as **Exhibit 3**) and the SOL Waiver (annexed hereto as **Exhibit 4**)—collectively provide a comprehensive resolution of the FCA Litigation and the related claims against the Debtors' Estates. On June 9, 2010, the Bankruptcy Court entered an order [Docket No. 1398] approving the FCA Settlement Agreements.

Under the FCA Settlement Agreement, the United States agreed to intervene (and did in fact intervene) in the FCA Litigation for purposes of settlement. Under the FCA Settlement Agreement, the United States will dismiss the FCA Litigation with prejudice and provide certain releases in exchange for BLC granting the United States an allowed general unsecured claim in an amount such that the United States receives two actual cash distributions totaling $10.1 million: one distribution in an amount equal to $8,200,000, in partial settlement of the FCA Litigation, and a second distribution in the amount of $1,900,000 to be remitted to the Relators in full satisfaction of their claims for costs and fees associated with the FCA Litigation. The FCA Settlement Agreement becomes void *ab initio* if such distributions are not made in accordance with the FCA Settlement Agreement. The FCA Settlement Agreement also obligates Ares Capital, as Allied Capital's successor by merger, to support and fund the Plan for the Debtors and provide releases to the FCA Settlement Parties (as defined in the FCA Settlement Agreement), all as detailed more specifically in the FCA Settlement Agreement. The Release Agreement releases the Relators' claims against the Debtors and Ares Capital for reimbursement

of the Relators' attorneys' fees and expenses in exchange for the United States remitting $1.9 million of its actual cash distribution to the Relators. The SOL Waiver simply extends the applicable statutes of limitation until the FCA Settlement Agreement becomes effective.

12.      The Disputes with the SBA and the Settlement Thereof

Pursuant to the terms and conditions of the March 6 Agreement and the *Escrow Agreement Between the U.S. Small Business Administration*, *Business Loan Center, LLC and Wells Fargo Bank, National Association*, dated March 6, 2007, (i) BLC established the Escrow Fund to cover reimbursements to the SBA for any SBA 7(a) Loans that defaulted and that "at any time in the future [became] the subject of a criminal conviction, or guilty pleas" by any past, present or future employee of BLC; (ii) BLC agreed to have an independent third party perform a "fraud and operational" review of newly originated SBA 7(a) Loans within seven business days after closing; (iii) BLC agreed to repurchase the guaranteed portion of any defaulted SBA 7(a) Loan from the secondary market and to cause a fraud review of such SBA 7(a) Loan to be conducted before triggering the SBA's obligation to pay the guaranteed amount to BLC; and (iv) BLC was allowed to continue as a participant in the SBA's "PLP" Program.

Ciena and BLC assert claims against the SBA in the approximate amount of $109,500,000, each of which claims the SBA disputes, asserts defenses to, and/or asserts offsets against, relating to the various disputes described in detail in the recitals to the SBA Settlement Agreement. The SBA asserts claims against BLC in the approximate amount of $87,000,000 (net present value), each of which claims BLC disputes, asserts defenses to, and/or asserts offsets against, relating to the various disputes described in detail in the recitals to the SBA Settlement Agreement. Each of BLC and the SBA claim entitlement to the entirety of the Escrow Fund.

On May 5, 2010, the Debtors, United States, acting through the United States Department of Justice and on behalf of the SBA, and Ares Capital (collectively, the "SBA Settlement Parties") entered into that certain Settlement and Plan Support Agreement (the "SBA Settlement Agreement"), a true and complete copy of which is annexed hereto as **Exhibit 5**. The SBA Settlement Agreement provides for a "walk-away" settlement under which the SBA Settlement Parties provide releases to one another of any and all claims. Additionally, the SBA Settlement Agreement obligates the SBA (but not any other federal agencies) to vote in favor of and otherwise support confirmation of a chapter 11 plan for the Debtors on the terms specified in the Plan Term Sheet annexed as an exhibit to the SBA Settlement Agreement and to support settlement of the Challenge Action. Finally, to minimize the possibility of recurring post-confirmation disputes between the SBA and the Debtors, the SBA Settlement Agreement establishes various operating covenants for the SBA and BLC, all as detailed more specifically in the SBA Settlement Agreement.

# V.  SUMMARY OF THE DEBTORS' THIRD
## AMENDED JOINT PLAN OF REORGANIZATION

> **THE FOLLOWING SUMMARY PROVIDES ONLY A GENERAL OVERVIEW OF THE PLAN, WHICH IS QUALIFIED IN ITS ENTIRETY BY THE PLAN WHICH IS ANNEXED HERETO AS EXHIBIT 1.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PROVISIONS OF THE PLAN AND THE SUMMARY CONTAINED HEREIN, THE TERMS OF THE PLAN WILL GOVERN.**

## A.    Classification and Treatment of Claims and Interests

The categories of Claims and Interests listed below classify Claims and Interests in the Debtors that are required to be designated in Classes pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  Classification of Claims and Interests in the Plan is for all purposes, including voting, Confirmation and distribution pursuant to the Plan.

A Claim or an Interest will be deemed classified in a particular Class only to the extent that the Claim or Interest in the Debtors qualifies within the description of that Class and will be deemed classified in a different Class only to the extent that any remainder of such a Claim or an Interest qualifies within the description of such different Class.

A Claim or Interest in the Debtors is placed in a particular Class only to the extent that such a Claim or an Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.  Notwithstanding any distribution provided for in the Plan, no distribution on account of any Claim is required or permitted unless and until such a Claim becomes an Allowed Claim, as the case may be, if at all, until after the Effective Date.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(2) and 507(a)(8) of the Bankruptcy Code have not been classified, and their treatment is set forth in Article III of the Plan.

The Plan designates eight Classes of Claims, one Class of Interests in the Debtors and leaves certain Claims unclassified.  The following sections describe more fully the classification and treatment of Claims and Interests in the Debtors under the Plan.

### 1.    Unclassified Claims – Administrative Claims and Priority Tax Claims

(a)    Administrative Claims

Except to the extent that a Holder of an Allowed Administrative Claim agrees to less favorable treatment, each Allowed Administrative Claim will be paid by the applicable Debtor or the Reorganized Debtor, as the case may be, in full, in Cash, upon the latest of (i) the Effective Date, (ii) the date upon which there is a final and non-appealable order of the Bankruptcy Court allowing such an Allowed Administrative Claim, and (iii) the date set forth in an agreement governing or documents evidencing such an Allowed Administrative Claim; provided, however, that Allowed Administrative Claims for goods or non-professional services provided to a Debtor

during the Chapter 11 Cases in the ordinary course of such Debtor's business will be paid or performed in accordance with the terms and conditions of the particular transactions and any agreements relating thereto.

Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims must be filed and served on the Reorganized Debtors and counsel for the Reorganized Debtors no later than the Administrative Claims Bar Date. Any Person or Entity that is required to file and serve a request for payment of an Administrative Claim and fails to timely file and serve such a request will be forever barred, estopped and enjoined from asserting such Claim against the Reorganized Debtors or participating in distributions under the Plan on account thereof.

The applicable Reorganized Debtor, in its sole and absolute discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. Any Reorganized Debtor or any other party with standing will have the right to object to any Administrative Claim by filing and serving on the appropriate parties, including the claimant, an objection to such an Administrative Claim on or before the Administrative Claims Objection Deadline. Unless a Reorganized Debtor or another party with standing objects to an Administrative Claim on or before the Administrative Claims Objection Deadline, such an Administrative Claim will be deemed an Allowed Administrative Claim in the amount requested. In the event that a Reorganized Debtor or another party with standing timely files and serves an objection to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, will submit the matter to the Bankruptcy Court for a determination of whether an Administrative Claim should be allowed, and if so, in what amount.

The payments, distributions and other treatment afforded to Holders of Allowed Administrative Claims under the Plan will be in full and complete satisfaction, discharge and release of such Allowed Claims.

> **UNDER THE PLAN, THE ADMINISTRATIVE CLAIMS BAR DATE IS THE DATE THAT IS THE FIRST BUSINESS DAY THIRTY (30) CALENDAR DAYS AFTER THE EFFECTIVE DATE OF THE PLAN. ALL REQUESTS FOR PAYMENT OF ADMINISTRATIVE CLAIMS ARISING ON OR BEFORE THE EFFECTIVE DATE, EXCLUDING CLAIMS OF PERSONS AND ENTITIES THAT SUPPLIED GOODS OR RENDERED SERVICES TO THE DEBTORS IN THE ORDINARY COURSE OF BUSINESS, MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE REORGANIZED DEBTORS ON OR BEFORE THE ADMINISTRATIVE CLAIMS BAR DATE OR BE FOREVER BARRED.**

(b)      Professional Fee Claims

Claims for Professional Fees are treated in all respects as Administrative Claims under the Plan and, thus, subject to both the Administrative Claims Bar Date and the Administrative Claims Objection Deadline. The Debtors or the Reorganized Debtors, as the case may be, may pay the charges incurred by any Professionals on or after the Confirmation Date for

Professionals' fees, disbursements, expenses or related support services (including fees and expenses related to the preparation of Professionals' fee applications) without application to, or approval of, the Bankruptcy Court.

(c)     Priority Tax Claims

Priority Tax Claims are Claims asserted by Governmental Units that are entitled to priority under section 507(a)(8) of the Bankruptcy Code. The Bankruptcy Code does not require Priority Tax Claims to be classified under a plan, but requires that such Claims receive the treatment described below. Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each Allowed Priority Tax Claim will be paid by the applicable Debtor or the Reorganized Debtor, as the case may be, in full, in Cash, upon the latest of (i) the Effective Date, (ii) the date upon which there is a final and non-appealable order of the Bankruptcy Court allowing such Priority Tax Claim, and (iii) the date upon which such Allowed Priority Tax Claim would have been due and payable if the Chapter 11 Cases had not been commenced. The payments, distributions and other treatment afforded to Holders of Allowed Priority Tax Claims under the Plan will be in full and complete satisfaction, discharge and release of such Allowed Claims. The Debtors believe the treatment afforded to Holders of Allowed Priority Tax Claims under the Plan satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code.

A Priority Tax Claim that is a Disputed Claim will not receive any distribution under the Plan unless and until such a Claim becomes an Allowed Priority Tax Claim. To the extent that some or all of a Secured Claim for taxes does not qualify as a Priority Tax Claim, but is a valid Secured Claim, it will be classified as a Class 3 Other Secured Claim.

2.     Class 1 - Priority Non-Tax Claims

a.     *Classification*:  Class 1 consists of Priority Non-Tax Claims against any of the Debtors.

b.     *Treatment*:  Unless a Holder of an Allowed Priority Non-Tax Claim and the applicable Debtor agree to a different treatment, each Holder of an Allowed Priority Non-Tax Claim will receive, in full and complete satisfaction, settlement, discharge and release of such Allowed Priority Non-Tax Claim, one of the following treatments, at the sole election of the applicable Debtor:

(i)     to the extent then due and owing on the Effective Date, such Allowed Priority Non-Tax Claim will be paid in full on the Effective Date, or as soon as reasonably practicable thereafter, in Cash, by the applicable Reorganized Debtor;

(ii)     to the extent not due and owing on the Effective Date, such Allowed Priority Non-Tax Claim will be paid in full, in Cash, by the applicable Reorganized Debtor when and as such Allowed Priority Non-Tax Claim becomes due and owing in the ordinary course of business in accordance with the terms thereof; or

(iii)     such Allowed Priority Non-Tax Claim will be otherwise treated in any manner such that Class 1 will not be Impaired.

c.     *Voting*:  Class 1 is Unimpaired.  Holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

3.     <u>Class 2 - Prepetition Secured Lender Claim</u>

a.     *Classification*:  Class 2 consists of the Prepetition Secured Lender Claim against the Debtors.

b.     *Treatment*:  In accordance with the Challenge Action Settlement, the Holder of the Prepetition Secured Lender Claim will be deemed to have made the election under section 1111(b)(2) of the Bankruptcy Code and, as a result, the Prepetition Secured Lender Claim will be treated as an Allowed Prepetition Secured Lender Claim in the amount of $327,038,549.27 exclusive of accrued but unpaid interest, costs, fees and expenses.  In full and complete satisfaction, settlement, discharge and release of the Allowed Prepetition Secured Lender Claim, on the Effective Date or as soon as reasonably practicable thereafter, the Holder of the Allowed Prepetition Secured Lender Claim will receive (i)  the promissory notes comprising the Restructured Credit Facility, and (ii) 100% of the Interests in the Reorganized Debtors.  The Holder of the Allowed Prepetition Secured Lender Claim may designate another Entity to hold all or any portion of the Interests in any Reorganized Debtor.

c.     *Voting*:  Class 2 is Impaired.  The Holder of the Allowed Prepetition Secured Lender Claim is entitled to vote to accept or reject the Plan.

4.     <u>Class 3 - Other Secured Claims</u>

a.     *Classification*:  Class 3 consists of Allowed Other Secured Claims against any of the Debtors.

b.     *Treatment*:  Holders of Allowed Other Secured Claims will receive, in full and complete satisfaction, settlement, discharge and release of such Allowed Other Secured Claims, on the Effective Date or as soon thereafter as reasonably practicable, a promissory note made by the applicable Debtor in the original principal amount equal to the amount of such Allowed Other Secured Claim bearing interest at the rate of the higher of (i) the contractual rate, and (ii) 6%, and payable in twelve (12) equal monthly installments commencing on the first Business Day of the first calendar month following the Effective Date.

c.     *Voting*:  Class 3 is Impaired.  Holders of Allowed Other Secured Claims are entitled to vote to accept or reject the Plan.

5.     <u>Class 4 - General Unsecured Claims against Business Loan Center, LLC, BLC Real Estate, LLC and BLC Real Estate (Texas), LLC</u>

a.     *Classification*:  Class 4 consists of Allowed General Unsecured Claims and Rejection Claims against Business Loan Center, LLC, BLC Real Estate, LLC and BLC Real Estate (Texas), LLC.  Holders of Allowed Class 4 Claims that do not exercise the Release Opt-Out Election are classified as Class 4(a) Claims.  Holders of Allowed Class 4 Claims that do exercise the Release Opt-Out Election are classified as Class 4(b) Claims.  The Allowed General

Unsecured Claim granted under the FCA Settlement will be classified and treated as an Allowed Class 4(a) Claim.

b.    *Treatment*:  Holders of Allowed Class 4(a) Claims will receive, in full and complete satisfaction, settlement, discharge and release of such Claims, on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to their Ratable Portion of the Unsecured Claimant Portion of the SBA Settlement Fund.

Holders of Allowed Class 4(b) Claims will receive, in full and complete satisfaction, settlement, discharge and release of such Claims, on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to 10% of their Ratable Portion of the Unsecured Claimant Portion of the SBA Settlement Fund; the other 90% of such Ratable Portion will constitute an Undistributed Settlement Amount.

c.    *Voting*:  Class 4 is Impaired.  Holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.

6.    <u>Class 5- General Unsecured Claims (Parent)</u>

a.    *Classification*:  Class 5 consists of Allowed General Unsecured Claims and Rejection Claims against either of the Parent Companies.  Holders of Allowed Class 5 Claims that do not exercise the Release Opt-Out Election are classified as Class 5(a) Claims. Holders of Allowed Class 5 Claims that do exercise the Release Opt-Out Election are classified as Class 5(b) Claims.

b.    *Treatment*:  Holders of Allowed Class 5(a) Claims will receive, in full and complete satisfaction, settlement, discharge and release of such Claims, on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to their Ratable Portion of the Unsecured Claimant Portion of the Parent Settlement Fund.

Holders of Allowed Class 5(b) Claims will receive, in full and complete satisfaction, settlement, discharge and release of such Claims, on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to 10% of their Ratable Portion of the Unsecured Claimant Portion of the Parent Settlement Fund; the other 90% of such Ratable Portion will constitute an Undistributed Settlement Amount.

c.    *Voting*:  Class 5 is Impaired.  Holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.

7.    <u>Class 6 - General Unsecured Claims (Conventional)</u>

a.    *Classification*:  Class 6 consists of Allowed General Unsecured Claims and Rejection Claims against Ciena Capital Funding.  Holders of Allowed Class 6 Claims that do not exercise the Release Opt-Out Election are classified as Class 6(a) Claims.  Holders of Allowed Class 6 Claims that do exercise the Release Opt-Out Election are classified as Class 6(b) Claims.

b. *Treatment*: Holders of Allowed Class 6(a) Claims will receive, in full and complete satisfaction, settlement, discharge and release of such Claims, on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to their Ratable Portion of the Unsecured Claimant Portion of the Conventional Settlement Fund.

Holders of Allowed Class 6(b) Claims will receive, in full and complete satisfaction, settlement, discharge and release of such Claims, on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to 10% of their Ratable Portion of the Unsecured Claimant Portion of the Conventional Settlement Fund; the other 90% of such Ratable Portion will constitute an Undistributed Settlement Amount.

c. *Voting*: Class 6 is Impaired. Holders of Allowed Class 6 Claims are entitled to vote to accept or reject the Plan.

8. <u>Class 7 - General Unsecured Claims (Agricultural)</u>

a. *Classification*: Class 7 consists of Allowed General Unsecured Claims and Rejection Claims against BLX Commercial Capital, LLC. Holders of Allowed Class 7 Claims that do not exercise the Release Opt-Out Election are classified as Class 7(a) Claims. Holders of Allowed Class 7 Claims that do exercise the Release Opt-Out Election are classified as Class 7(b) Claims.

b. *Treatment*: Holders of Allowed Class 7(a) Claims will receive, in full and complete satisfaction, settlement, discharge and release of such Claims, on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to their Ratable Portion of the Unsecured Claimant Portion of the Agricultural Settlement Fund.

Holders of Allowed Class 7(b) Claims that make the Release Opt-Out Election will receive, in full and complete satisfaction, settlement, discharge and release of such Claims, on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to 10% of their Ratable Portion of the Unsecured Claimant Portion of the Agricultural Settlement Fund; the other 90% of such Ratable Portion will constitute an Undistributed Settlement Amount.

c. *Voting*: Class 7 is Impaired. Holders of Allowed Class 7 Claims are entitled to vote to accept or reject the Plan.

9. <u>Class 8 - Subordinated Claims</u>

a. *Classification*: Class 8 consists of Allowed Subordinated Claims.

b. *Treatment*: On the Effective Date, all Allowed Subordinated Claims will be discharged, and no Holder of an Allowed Subordinated Claim will receive or retain any distribution or property on account of such Subordinated Claim.

c. *Voting*: Class 8 is Impaired. Holders of Allowed Subordinated Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

10. <u>Class 9- Interests in the Debtors</u>

      a.    *Classification*:  Class 9 consists of Allowed Interests in the Debtors.

      b.    *Treatment*:  On the Effective Date, the Allowed Interests in the Debtors will be indefeasibly canceled and extinguished.

      c.    *Voting*:  Class 9 is Impaired.  Holders of Allowed Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

## B.    <u>Disputed Claims</u>

No distribution or other payment or treatment will be made on account of a Disputed Claim, even if a portion of the Claim is not disputed, unless and until such Disputed Claim becomes an Allowed Claim and the amount and nature of such an Allowed Claim is determined by a final and non-appealable order of the Bankruptcy Court, by a stipulation between the Debtors and the Holder of the Claim that is executed prior to the Effective Date and that has been approved by the Bankruptcy Court, or by a stipulation by the Reorganized Debtors and the Holder of the Claim that is executed after the Effective Date.  No distribution or other payment will be made on account of a Disallowed Claim at any time.

## C.    <u>Full Satisfaction, Discharge and Release</u>

Except to the extent that a Claim is expressly preserved in the FCA Settlement or the SBA Settlement, the payments, distributions and other treatment afforded to Holders of Allowed Claims and Interests in the Debtors under Article IV of the Plan will be in full and complete satisfaction, settlement, discharge and release of such Allowed Claims and Interests in the Debtors.

## D.    <u>Cancellation of Existing Agreements and Securities</u>

Except to the extent Reinstated or left Unimpaired under the Plan, or for the purposes of evidencing a right to distribution under the Plan, on the Effective Date, all the agreements or other documents evidencing any Claims or rights of any Holder of a Claim against any Debtor, including all indentures, credit agreements, security agreements and promissory notes evidencing such Claims, and any Interests in a Debtor, options or warrants (regardless of whether exercised) to purchase Interests in a Debtor, will be deemed canceled, surrendered to the applicable Debtor, and of no further force or effect.

## E.    <u>Treatment of Executory Contracts and Unexpired Leases under the Plan</u>

1.    <u>Treatment of Executory Contracts and Unexpired Leases</u>

As of and subject to the occurrence of the Effective Date of the Plan and the payment of any Cure Claim as and when required under the Plan, each executory contract or unexpired lease to which any Debtor is a party will be deemed assumed except for any executory contracts and unexpired leases that (i) previously have been assumed or rejected pursuant to a final and non-

appealable order of the Bankruptcy Court, (ii) are listed specifically or by category on the Rejection Schedule, or (iii) are the subject of a pending motion to assume or reject as of the Effective Date.

2. <u>Rejection of Certain Securitization-Related Executory Contracts</u>

The Debtors intend and expect to list on the Rejection Schedule (which is part of the Plan Supplement to be filed no later than five business days prior to the Voting Deadline) as executory contracts to be rejected under the Plan all contractual obligations of any Debtor as a "seller" in any securitization-related document. Under the ruling in *DB Structured Prods. v. American Home Mortgage Holdings, Inc. (In re American Home Mortgage Holdings, Inc.)*, 402 B.R. 87, 100 (Bankr. D. Del. 2009) and its reported and unreported jurisprudential predecessors, and in accordance with long-standing convention in mortgage seller/servicer bankruptcies, the Debtors assert that their respective "seller-related" contractual obligations represent separate and independent contracts that are divisible under applicable law from the Debtors' contractual obligations as "servicer," notwithstanding the fact that, in many if not all instances, both sets of contractual obligations were documented in the same instrument. Accordingly, the Debtors intend to reject such "seller" contracts even though they are assuming all of their respective "servicer" contracts. Each of the securitization-related documents to which the Debtors intend to apply the *American Home Mortgage* divisibility analysis explicitly individuate "seller" obligations from "servicer" obligations, but the Debtors nevertheless will specify in the Rejection Schedule the particular provisions that constitute the "seller" contracts that are being rejected. The Debtors do not expect any material amount of Rejection Claims to be allowed as a result of the rejection under the Plan of such "seller" executory contracts.

2. <u>Rejection Claims</u>

All Rejection Claims that have not been allowed by a final and non-appealable order of the Bankruptcy Court prior to the Confirmation Date will be filed on or before the Rejection Claims Bar Date. Rejection Claims that have not been allowed by a final and non-appealable order of the Bankruptcy Court and are not filed on or before the Rejection Claims Bar Date will be disallowed and discharged in their entirety without further order of or process before the Bankruptcy Court. Allowed Rejection Claims will be classified and treated as Allowed General Unsecured Claims in Classes 4, 5, 6 or 7, as applicable.

> **UNDER THE PLAN, THE REJECTION CLAIMS BAR DATE IS THE LATER OF (i) THE FIRST BUSINESS DAY THAT IS THIRTY (30) CALENDAR DAYS AFTER THE CONFIRMATION DATE AND (ii) THE FIRST BUSINESS DAY THAT IS THIRTY (30) CALENDAR DAYS AFTER THE BANKRUPTCY COURT ENTERS AN ORDER APPROVING THE REJECTION OF THE EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT GIVES RISE TO THE REJECTION CLAIM. ALL REJECTION CLAIMS MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE REORGANIZED DEBTORS ON OR BEFORE THE REJECTION CLAIMS BAR DATE OR BE FOREVER BARRED.**

3.     <u>Cure Claims</u>

All Cure Claims known to the Debtors that have not been allowed by a final and non-appealable order of the Bankruptcy Court prior to the Confirmation Date will be listed by the Debtors on the Cure Claims Schedule. Holders that disagree with the amount of a Cure Claim on the Cure Claims Schedule or assert a Cure Claim that is not listed on the Cure Claims Schedule will have to file an objection to the Cure Claims Schedule with the Bankruptcy Court, and serve such objection on the appropriate parties, including counsel for the Debtors and the Committee, prior to the Cure Claims Dispute Deadline. Any Cure Claim that has not been allowed by a final and non-appealable order of the Bankruptcy Court, was not listed on the Cure Claims Schedule, and was not the subject of an objection to the Cure Claims Schedule filed prior to the Cure Claims Dispute Deadline, will be disallowed and discharged in its entirety. Any Cure Claim that has not been allowed by a final and non-appealable order of the Bankruptcy Court, exceeds the amount of such Cure Claim listed on the Cure Claims Schedule, and was not the subject of an objection to the Cure Claims Schedule filed prior to the Cure Claims Dispute Deadline, will be disallowed and discharged to the extent such Cure Claim exceeds the amount set forth on the Cure Claims Schedule.

**F.**     **<u>Means for Implementation of the Plan</u>**

1.     <u>Revolving Credit Facility</u>

On the Effective Date, Ares Capital will provide the Revolving Credit Facility, which will be available and used by the Reorganized Debtors to pay ordinary operating expenses as well to make distributions called for by the Plan.

2.     <u>Restructured Credit Facility</u>

On the Effective Date, the Debtors will execute and deliver the promissory notes and related documentation comprising the Restructured Credit Facility to the Prepetition Secured Lender.

3.     <u>Settlements</u>

The Debtors will make all payments and otherwise consummate the transactions required by the Settlements in accordance with the terms thereof. Notwithstanding any provision in the Plan or in the Confirmation Order, the terms of the Settlements will remain binding and enforceable in accordance with their terms. No provision of the Plan or the Confirmation Order will constitute a waiver or modification of any provision of any of the Settlements.

4.     <u>Execution of Related Documents</u>

On the Effective Date, all Plan Documents entered into or instruments issued in connection with any of the Plan Documents will be delivered and executed by the Reorganized Debtors, and will become effective and binding in accordance with their respective terms and conditions upon the parties thereto and as specified therein.

5.       <u>Governance of the Reorganized Debtors</u>

(a)     *Operating Agreements and Charters.*   On the Effective Date, the Reorganized Debtors will adopt revised operating agreements and corporate charters, as applicable, in substantially the form included in the Plan Supplement. All of the outstanding Interests in the Reorganized Debtors will be issued to and held by the Prepetition Secured Lender or its designee. Following the Effective Date, the Reorganized Debtors may amend and restate their Operating Agreements, corporate charters, and other constituent documents as permitted by state law.

(b)     *Managers, Directors and Officers.*   Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, and except as may otherwise be disclosed in this Disclosure Statement, on the Effective Date, the managers and officers who are identified in the Plan Supplement will serve as the initial Board of Managers and officers of the Reorganized Debtors that are limited liability companies. Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, and except as may otherwise be disclosed in this Disclosure Statement, on the Effective Date, the directors and officers who are identified in the Plan Supplement will serve as the initial Board of Directors and officers of the Reorganized Debtors that are corporations. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement, on or prior to the Confirmation Date, the identity and affiliations of any Person proposed to serve on a Reorganized Debtor's Board of Managers or Board of Directors and, to the extent such Person is an insider, the nature of any compensation for such Person. After the Effective Date, the corporate governance and management of the Reorganized Debtors will be determined by the applicable Board of Managers or Board of Directors in accordance with the laws of the applicable state of organization.

6.       <u>Elimination of Classes</u>

Any Class of Claims that is not occupied as of the date of commencement of the Confirmation Hearing by an Allowed Claim, or a Claim temporarily Allowed under Bankruptcy Rule 3018, will be deemed deleted from the Plan for the purposes of (i) voting on the acceptance or rejection of the Plan, and (ii) determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

7.       <u>Release of Liens</u>

On or before the Effective Date, the Administrative Agent will file a notice or other public statement as is necessary or appropriate to evidence the termination of the Liens formerly held by the Prepetition Secured Lender and the termination of any financing statements relating to any and all Liens on the Debtors' Assets under or in connection with the Prepetition Credit Facility. In addition, each Reorganized Debtor is hereby appointed as attorney-in-fact for each party whose Lien is terminated pursuant to the Plan, with full power and authority to execute on behalf of such party any notices or other public statements as are necessary or appropriate to evidence the termination of such party's Lien and any financing statement relating to any and all security interests in the Assets.

8.      Indemnification of Directors, Officers and Employees

The obligations of each Debtor to indemnify any Person serving at any time on or prior to the Effective Date as one of its directors, managers, officers or employees by reason of such Person's service in such capacity, or as a director, a manager, an officer, a partner, a trustee, an employee or an agent of such Debtor to the extent provided in such Debtor's constituent documents, by a written agreement with such Debtor or applicable state law, each as applicable, will be deemed and treated as executory contracts that are assumed by the applicable Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date. Accordingly, such indemnification obligations will survive unimpaired and unaffected by the entry of the Confirmation Order and the occurrence of the Effective Date, irrespective of whether such indemnification is owed for an act or an event occurring before or after the Petition Date, except if such Claim or liability is determined by a final and non-appealable order of the Bankruptcy Court to have resulted from gross negligence, willful misconduct, fraud or criminal conduct of such indemnified Person.

9.      United States Trustee Fees

The Reorganized Debtors will pay quarterly fees to the Office of the United States Trustee until their Chapter 11 Cases are closed under section 350 of the Bankruptcy Code and provide relevant reports to show the amount of such fees that are due.

10.     Revocation and Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan at any time before entry of the Confirmation Order.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Hearing, or if Confirmation of the Plan or the Effective Date does not occur, then the Plan will be deemed to be null and void as to the Debtors' Estates.  In such an event, nothing contained in the Plan or in any document relating to the Plan will be deemed to constitute an admission of validity, waiver or release of any Claims by or against the Debtors or any Person or any Entity or to prejudice in any manner the rights of the Debtors or any Person or any Entity in any proceeding involving the Debtors.

**G.      Release, Injunctive and Related Provisions of the Plan**

1.      Releases

**In consideration of the contributions of the Released Parties to the Debtors' reorganization and Chapter 11 Cases, the Plan provides for the following releases:**

(a)     **Releases by the Debtors and Reorganized Debtors.**  *Except as otherwise provided in the Plan, a Plan Document or the Confirmation Order, as of the Effective Date, for good and valuable consideration including but not limited to the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, each of the Debtors and Reorganized Debtors will irrevocably and absolutely release all Released Parties from any and all Claims and Causes of Actions that the Debtors or the Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim*

*or Interest or other Entity or Person, based in whole or in part upon any act of omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date arising out of or in any way related to the Debtors, the Reorganized Debtors or the Chapter 11 Cases; provided, however, that there will be no such release on account of Claims or liabilities in respect of any contractual obligation owed by such Entity or Person to the Debtors or the Reorganized Debtors; provided, further, that the provisions of Section 10.1(a) of the Plan will have no effect on the liability of any of the Released Parties for gross negligence, willful misconduct, fraud or criminal conduct as determined by a final and non-appealable order of the Bankruptcy Court.*

(b)    **Releases by Holders of Claims.**  *Except as otherwise provided in the Plan, a Plan Document or the Confirmation Order, on and after the Effective Date, in exchange for their distributions under the Plan, each Holder of a Claim who has voted to accept the Plan and has not exercised the Release Opt-Out Election will be deemed to have released irrevocably and absolutely each of the Released Parties from any and all Claims or Causes of Action based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date arising out of or in any way related to the Debtors or Reorganized Debtors or the Chapter 11 Cases; provided, however, that the provisions of section 10.1(b) of the Plan will have no effect on the liability of the Released Parties for gross negligence, willful misconduct, fraud or criminal conduct as determined by a final and non-appealable order of the Bankruptcy Court (the "Third-Party Releases").*

2.    <u>Exculpations and Limitation of Liability</u>

*Except as otherwise provided in the Plan, a Plan Document or the Confirmation Order, as of the Effective Date, for good and valuable consideration including but not limited to the service of the Exculpated Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, none of the Exculpated Parties will have or incur any liability to any Holder of a Claim or Interest for any action or omission arising out of or in connection with the Debtors' restructuring or the Chapter 11 Cases, including without limitation the commencement of the Chapter 11 Cases, the negotiation, execution and performance of the Plan, the Disclosure Statement, or any Plan Document, the solicitation of votes for and the pursuit of Confirmation of the Plan, the Effective Date of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan; provided, however, that the provisions of section 10.2 of the Plan will have no effect on the liability of the Exculpated Parties for gross negligence, willful misconduct, fraud or criminal conduct as determined by a final and non-appealable order of the Bankruptcy Court. The Exculpated Parties will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under and in connection with the Plan.*

3.    <u>Injunction Related to Releases and Exculpations</u>

*Except as otherwise provided in the Plan, a Plan Document or the Confirmation Order, and in addition to the injunction provided under sections 524(a) and 1141 of the Bankruptcy Code, the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released or exculpated pursuant*

*to the Plan, including without limitation the Claims and Causes of Action released in sections 10.1 and 10.2 of the Plan.*

4. Limitation on Releases and Exculpations

For the avoidance of doubt, the FCA Settlement and the SBA Settlement constitute Plan Documents that fall within the "otherwise provided" exception in the first sentence of each of subsections 10.1 of the Plan and in the first sentence of section 10.2 of the Plan. Accordingly, the releases and exculpations in subsections 10.1 of the Plan and section 10.2 of the Plan will not apply to the Claims between or among any or all of the parties to the FCA Settlement or the SBA Settlement, which Claims are described more particularly in the FCA Settlement and the SBA Settlement. Rather, the only releases and exculpations applicable to such Claims are those set forth in the FCA Settlement and the SBA Settlement.

## H. Plan Provisions Governing Distributions

1. Objections

All objections to Claims other than Cure Claims and Administrative Claims will be filed by the Claims Objection Deadline or will be forever barred.

2. Estimation of Claims

A Debtor (prior to the Effective Date) or a Reorganized Debtor (after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim asserted by any Person or Entity, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, a Debtor (prior to the Effective Date) or a Reorganized Debtor (after the Effective Date) may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

3. Distribution for Claims Allowed as of the Effective Date

Except as otherwise provided in Article VII of the Plan, in a Plan Document, or as may be ordered by the Bankruptcy Court, distributions to be made to Holders of Allowed Claims on the Effective Date that are entitled to receive distributions under the Plan will be made on the Effective Date or as soon as reasonably practicable thereafter. The Debtors will reduce amounts otherwise distributable to Holders of Allowed Claims from the applicable Settlement Fund on the Effective Date by the extent, if any, by which the maximum estimated distribution in respect

of Disputed Claims, as determined by the Debtors in the exercise of their good faith business judgment or determined by the Bankruptcy Court in accordance with section 7.2 of the Plan, exceeds $500,000. Distributions on account of Disputed Claims that become Allowed Claims after the Effective Date will be made pursuant to section 7.5 of the Plan. The Debtors are not establishing a disputed claims reserve to fund the payment of Disputed Claims that become Allowed Claims after the Effective Date because the Debtors believe they will have ample liquidity to fund all Cash payments called for under the Plan.

4.     Delivery of Distributions; Undeliverable Distributions

(a)     Subject to Article VII of the Plan, distributions to Holders of Allowed Claims will be made (i) at the addresses set forth on the respective Proofs of Claim filed by such Holders, (ii) at the addresses set forth in any written notices of address change delivered to any of the Debtors or Reorganized Debtors after the date on which the related Proof of Claim was filed, or (iii) at the addresses reflected in the Debtors' Schedules if no Proof of Claim has been filed and neither of the applicable Debtor nor the Reorganized Debtor has received a written notice of a change of address.

(b)     If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor as undeliverable, no further distribution will be made to such Holder, and the Reorganized Debtor will have no obligation to make any further distribution to the Holder, unless and until the Reorganized Debtor is notified in writing of such Holder's then current address. Subject to section 7.4(c) of the Plan, the Reorganized Debtor will retain undeliverable distributions until such time as a distribution becomes deliverable.

(c)     Any Holder of an Allowed Claim who does not assert a claim for an undeliverable distribution within one year after the Effective Date on account of such Claim will no longer have any claim to or interest in such undeliverable distribution, will be forever barred and enjoined from receiving any distribution under the Plan, will be forever barred and enjoined from asserting any such Claim against the Reorganized Debtor and its property, and such amount will constitute an Undistributed Settlement Amount.

5.     Disputed Claims

(a)     No distribution or other payment or treatment will be made on account of a Disputed Claim, even if a portion of the Claim is not disputed, unless and until such Disputed Claim becomes an Allowed Claim and the amount of such Allowed Claim is determined by a final and non-appealable order of the Bankruptcy Court, by a stipulation between the applicable Debtor and the Holder of the Claim, or by a stipulation between the Reorganized Debtor and the Holder of the Claim. No distribution or other payment or treatment will be made on account of a Disallowed Claim at any time.

(b)     If such Holder's Claim ever becomes an Allowed Claim, the Debtor that is the obligor in respect of such Claim will have a recourse obligation to pay to such Holder the entire amount of the distribution on account of such Allowed Claim to which such Holder would have been entitled to under the Plan had such Holder's Claim been an Allowed Claim on the Effective Date.

(c)     As to any Disputed Claim for which a Proof of Claim has been filed in an unliquidated amount or for which a Proof of Claim has been filed that denominates the Claim as contingent, the Bankruptcy Court will, upon a motion by the applicable Debtor or Reorganized Debtor to be filed on or before Claims Objection Deadline, estimate the maximum allowable amount, if any, of such Disputed Claim under section 502(c) of the Bankruptcy Code.  Any final and non-appealable order of the Bankruptcy Court that estimates a Disputed Claim pursuant to sections 7.2 and 7.5(c) of the Plan irrevocably will constitute and be a conclusive and final determination of the maximum allowable amount of the Claim of such Creditor, should it become an Allowed Claim.  After the estimation of the maximum allowable amount of the Claim of such Creditor, the Debtor or Reorganized Debtor may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim.

The Holder of a Disputed Claim that is estimated by the Bankruptcy Court pursuant to sections 7.2 and 7.5(c) of the Plan will not be entitled to any subsequent reconsideration or upward adjustment of the maximum allowable amount of such Claim as a result of any subsequent adjudication or an actual determination of the Allowed amount of such a Disputed Claim or otherwise, and the Holder of such a Claim will not have recourse to the Debtors or Reorganized Debtors, or any of their Assets in the event the allowed amount of the Holder's Claim is at any time later determined to exceed the estimated maximum allowable amount.

(d)     Within ten (10) Business Days following the date that a Disputed Claim becomes an Allowed Claim after the Effective Date, the Reorganized Debtors will pay directly to the Holder of such an Allowed Claim the amount provided for under Articles III or IV of the Plan, as applicable.

6.     Prosecution of Objections to Claims

After the Confirmation Date, the applicable Reorganized Debtor will have the exclusive authority and standing to file, settle, compromise, withdraw or litigate to judgment objections to any Claims, and may settle or compromise any Disputed Claim without the approval of the Bankruptcy Court.  All Disputed Claims will be determined, resolved or adjudicated in the manner in which such Claims would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced, unless the Reorganized Debtor, by its election, chooses to determine, resolve or adjudicate in the Bankruptcy Court any Disputed Claims arising in the Chapter 11 Cases.

7.     Disbursement of Funds

The Reorganized Debtors or their duly appointed disbursing agent will make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise.   All Cash and other property held by the Reorganized Debtors for distribution to Creditors will be held in trust for the exclusive benefit of the Holders of Allowed Claims and will not be subject to any claim by any Person or Entity except as provided under the Plan.

8.      Direction to Parties

From and after the Effective Date, a Debtor or Reorganized Debtor may apply to the Bankruptcy Court for an order directing any necessary party to execute or deliver, or to join in the execution or delivery, of any instrument required to effect a transfer of property required under the Plan, and to perform any other act, including the satisfaction of any Lien, that is necessary for the consummation of the Plan, pursuant to section 1142(b) of the Bankruptcy Code.

9.      Setoffs and Recoupments

A Debtor or Reorganized Debtor may, to the extent permitted under applicable law, setoff or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Claim), the claims, rights and Causes of Action of any nature that a Debtor or a Reorganized Debtor may hold against the Holder of such Allowed Claim; provided however, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim under the Plan will constitute a waiver or a release by the applicable Debtor or Reorganized Debtor of any such claims, rights and Causes of Action that a Debtor or Reorganized Debtor may possess against such Holder.

10.      No Recourse

No Holder of any Disputed Claim that becomes an Allowed Claim in any applicable Class will have recourse against the disbursing agent, the Debtors, the Reorganized Debtors, or any other Holder of an Allowed Claim or any of their respective professionals, consultants, advisors, officers, directors or members or their successors or assigns, or any of their respective property, if the Cash or Interests allocated to such Class and not previously distributed are insufficient to provide a distribution to such Holder in the same proportion to that received by other Holders of Allowed Claims in such Class. However, nothing in the Plan will modify any right of a Holder of a Claim under section 502(j) of the Bankruptcy Code.

11.      Manner of Payment Under Plan of Reorganization

At the option of the Reorganized Debtors, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

12.      No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim will receive in respect of any such Claim any distribution in excess of the allowed amount of such Claim.

13.      Treatment of the Undistributed Settlement Amounts

All Undistributed Settlement Amounts will be used by the Reorganized Debtors first to reduce the outstanding balance, if any, of the Revolving Credit Facility, and second, to reduce the outstanding balance, if any, of the Restructured Credit Facility.

## I.  Conditions Precedent to Confirmation and Effective Date of the Plan

    1.  Condition Precedents to Confirmation

It is a condition to Confirmation of the Plan that all provisions, terms and conditions of the Plan will have been approved in the Confirmation Order or waived pursuant to the provisions of section 8.3 of the Plan.  It is a further condition to Confirmation of the Plan that the Plan, Plan Documents, Plan Supplement, Disclosure Statement and Confirmation Order all be in form and substance reasonably satisfactory to the Administrative Agent and the Prepetition Secured Lender.

    2.  Conditions Precedent to the Effective Date

        a.  The Confirmation Order will have been approved by the Bankruptcy Court and duly entered on the docket for the Chapter 11 Cases by the Clerk of the Bankruptcy Court, and will have become a Final Order;

        b.  The Settlements will have been approved by the Bankruptcy Court in one or more Final Orders;

        c.  There will not be in effect any order, law or regulation staying, restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by the Plan;

        d.  Any and all necessary governmental, regulatory and third-party approvals, waivers and/or consents with respect to the Settlements have been obtained, effected and/or executed and remain in full force and effect;

        e.  All statutory fees owed to the United States Trustee will have been paid in full; and

        f.  All other actions and documents necessary to implement the provisions of the Plan and the Plan Documents on the Effective Date will have been, respectively, effected or duly executed and delivered.

    3.  Waiver of Conditions

The Debtors may waive any of the conditions precedent to Confirmation of the Plan set forth in section 8.1 of the Plan and the conditions precedent to occurrence of the Effective Date set forth in section 8.2 of the Plan (other than the conditions precedent in subsections 8.2(b), 8.2(d) and 8.2(f) of the Plan), at any time, without notice, without leave or an order of the Bankruptcy Court, and without any formal action other than a proceeding to confirm and/or consummate the Plan.

    4.  Effect of Non-Occurrence of Conditions Precedent to the Effective Date

If the conditions precedent to occurrence of the Effective Date have not been satisfied or waived in accordance with Article VIII of the Plan on or before the first Business Day that is

more than 60 days after the Confirmation Date or by such later date as is approved by the Bankruptcy Court after notice and a hearing, then on a motion by the Debtors made prior to the time that all of the conditions precedent have been satisfied or waived, the Bankruptcy Court may vacate the Confirmation Order and the Confirmation Order will be of no force and effect. Notwithstanding the foregoing, the Confirmation Order will not be vacated if all of the conditions to the occurrence of the Effective Date set forth in Article VIII of the Plan are either satisfied or waived, in accordance with the terms thereof, prior to the entry by the Bankruptcy Court of an order granting the relief requested in such motion.

If the Confirmation Order is vacated, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (i) constitute a waiver or a release of any Claims by or against the Debtors or any Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors; or (iii) constitute an admission, an acknowledgment, an offer or an undertaking by the Debtors in any respect.

**J.     Effects of Confirmation of the Plan**

1.     Vesting of Assets in Reorganized Debtors

Except as otherwise provided in the Plan or any agreement, instrument or indenture relating thereto, on the Effective Date, to the maximum extent that Claims can be discharged pursuant to the Bankruptcy Code, all property of the Debtors' Estates, and any property acquired by such Debtors or Reorganized Debtors under the Plan, will vest in the applicable Reorganized Debtor, in accordance with sections 1141(b) and (c) of the Bankruptcy Code, free and clear of all Claims, Liens, charges, or other encumbrances and interests. On or after the Effective Date, the Reorganized Debtors may operate their respective businesses and may use, acquire, or dispose of property and compromise or settle any Claims without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan and the Confirmation Order. Without limiting the foregoing, all rights, privileges, entitlements, authorizations, grants, permits, licenses, easements, franchises and other similar items which constitute part of, or are necessary or useful in the operation of, the property of the Debtors' Estates or the business of the Reorganized Debtors, whether in the United States or elsewhere, will be vested in the Reorganized Debtor to the same and full extent they would have been exercisable and usable by the applicable Debtor before the Petition Date.

2.     Discharge of Claims Against the Debtors and Cancellation of Interests

Except as otherwise provided in the Plan or in the Confirmation Order, and except to the extent a Claim is expressly expressed preserved in the FCA Settlement or the SBA Settlement, pursuant to section 1141(d) of the Bankruptcy Code, to the maximum extent permissible under the Bankruptcy Code, and to the maximum extent that Claims can be discharged pursuant to the Bankruptcy Code, (i) the rights afforded in the Plan, and the treatment of all Claims and Interests therein, will be in exchange for and in complete satisfaction, discharge and release of Claims against the Debtors and Interests in the Debtors of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred on such Claims from and after the Petition Date, against the Debtors, the Reorganized Debtors, or any of their Estates, Assets or properties,

(ii) on the Effective Date, all such Claims against the Debtors, and Interests in the Debtors will be satisfied, discharged and released in full, and (iii) all Entities and Persons will be precluded from asserting against the Reorganized Debtors, their successors or their assets or properties any other or further Claims or Interests based upon any act of omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date. For purposes of clarity, all Disputed Claims will be determined, resolved or adjudicated in accordance with the terms of Article VII of the Plan. On the Effective Date, the Interests in the Debtors will be deemed extinguished, canceled and of no further force or effect without any further act or action under any applicable agreement, law, regulation, order or rule and without any further action on the part of the Bankruptcy Court or the related Reorganized Debtor.

### 3. Binding Effect

On and after the Confirmation Date, and subject to the occurrence of the Effective Date, the provisions of the Plan will bind any Holder of a Claim against the Debtors or Interests in the Debtors and their respective successors and assigns, regardless of whether (i) the Claim or Interest of such Holder is Impaired under the Plan, (ii) such Holder voted to accept or reject the Plan, or (iii) such Holder exercised the Release Opt-Out Election.

### 4. No Waiver of Discharge

Except as expressly set forth in section 9.2 of the Plan, nothing in the Plan will be deemed to waive, limit or restrict in any way the discharge granted upon Confirmation of the Plan pursuant to section 1141 of the Bankruptcy Code.

### 5. Preservation of Causes of Action; Standing of Reorganized Debtors

Except as otherwise provided in the Plan or in any Plan Document, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain and have the exclusive standing to commence litigation with respect to, prosecute, settle, compromise, withdraw or abandon all Causes of Action that the Debtors or their Estates may hold against any Person or Entity. No Bankruptcy Court approval will be required for any such action by the Reorganized Debtors after the Confirmation Date.

## K. Miscellaneous Provisions of the Plan

### 1. Governing Law

Except to the extent the Bankruptcy Code or the Bankruptcy Rules are applicable, and subject to the provisions of any Plan Document, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the laws of the State of New York, notwithstanding any conflicts of law principles, rules or laws to the contrary.

### 2. Payment of Statutory Fees

On the Effective Date, and thereafter as may be required until the entry of a Final Decree, the Reorganized Debtors will pay all fees payable pursuant to section 1930 of Title 28 of the United States Code and section 3717 of Title 31 of the United States Code.

3. <u>Substantial Consummation</u>

On the Effective Date, the Plan will be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

4. <u>Amendments</u>

The Plan may be amended, modified, or supplemented by the Debtors or Reorganized Debtors in the manner provided in section 1127 of the Bankruptcy Code or as otherwise permitted under applicable law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of Holders of Claims or Interests under the Plan, the Debtors or Reorganized Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

5. <u>Term of Injunctions or Stays</u>

Unless otherwise provided in accordance with the Plan or an applicable order of the Bankruptcy Court, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code will remain in full force and effect until the Effective Date.

6. <u>Section 1145 Exemption</u>

Pursuant to section 1145(a) of the Bankruptcy Code, neither section 5 of the Securities Act of 1933 nor any state or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, will apply with respect to any security being offered, sold or transferred under the Plan, including without limitation all of the Interests in the Reorganized Debtors.

7. <u>Section 1146 Exemption</u>

Pursuant to section 1146(a) of the Bankruptcy Code, neither (i) the issuance, transfer or exchange of any security under the Plan, including the issuance of the Interests in the Reorganized Debtors nor (ii) the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale or assignments executed in connection with any disposition of assets contemplated by the Plan (including real and personal property) will be subject to any stamp, real estate transfer, mortgage recording, sales, use or similar tax.

8. <u>Compliance with Tax Requirements</u>

In connection with the Plan, to the extent applicable, the Debtors, Reorganized Debtors or any agent thereof making disbursements in accordance with the Plan is entitled but will have no obligation to deduct any federal, state or local withholding taxes from any distribution made as reasonably appropriate. All Holders of Allowed Claims will be required to provide any

information reasonably requested to effect the withholding of such taxes, and the Debtors, Reorganized Debtors or any disbursement agent thereof may withhold any distribution absent the provision of such information or further order of the Bankruptcy Court.  If the Holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirement of any Governmental Unit within 60 days after the date of first notification by the Debtor, the Reorganized Debtor or any disbursement agent to the Holder of the Claim of the need for such information, then such Holder's distribution will be treated as an unclaimed distribution in accordance with section 7.4 of the Plan.

9.      Further Assurances

The Debtors and the Reorganized Debtors are authorized to execute, deliver, file or record such documents, contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan.

10.      Severability of Plan Provisions

If, prior to entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms of the Plan will remain in full force and effect and in no way will be affected, impaired or invalidated by such holding, alternation or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

11.      Service of Documents

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtors will be sent by first class mail, postage prepaid or reliable overnight courier (e.g. Federal Express) to each of the following:

> Ciena Capital LLC
> 1515 Broadway, 11th Floor
> New York, New York 10036
> Attn:   Louis Hafkin
>
> -with copies to-
>
> Hunton & Williams LLP
> 200 Park Avenue, 53rd Floor
> New York, New York 10166
> Attn:   Peter S. Partee, Esq.

-and-

Office of the United States Trustee for the
Southern District of New York
33 Whitehall Street, 21st Floor
New York, New York 10004
Attn:   Brian S. Masumoto, Esq.

12.     Dissolution of the Committee

On the Effective Date, the Committee will dissolve.

13.     Notice of Effective Date

No later than five calendar days after the Effective Date, the Reorganized Debtors will file a notice of the occurrence of the Effective Date and mail such a notice via first class mail, postage prepaid, to all parties required to receive such notice under the Bankruptcy Rules or that have filed a notice of appearance and request for service in the Chapter 11 Cases.

14.     Conflicts

Except as set forth in the Plan, to the extent that any provision of this Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan will govern and control.

15.     Filing of Additional Documents

On or before the Effective Date, the Debtors or Reorganized Debtors may file such agreements and documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**L.      Retention of Jurisdiction**

1.      General Scope of Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, and subject to the jurisdictional provisions of the FCA Settlement and the SBA Settlement, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Plan, the Confirmation Order and the Chapter 11 Cases to the fullest extent permitted by law, including without limitation such jurisdiction as is necessary to ensure that the purposes and intent of the Plan are carried out.

2.      Claims and Causes of Action

The Bankruptcy Court will retain jurisdiction (i) to classify, resolve objections to, determine the allowance or disallowance, or estimate pursuant to section 502(c) of the

Bankruptcy Code all Claims against, and Interests in, the Debtors and Reorganized Debtors and (ii) to adjudicate and enforce all Causes of Action owned by the Debtors or Reorganized Debtors. After the Effective Date, the applicable Reorganized Debtor will have the exclusive authority and standing to file, prosecute, withdraw, settle or compromise, without the approval of the Bankruptcy Court, all (i) objections to Claims, (ii) estimation proceedings with respect to Claims, and (iii) Causes of Action.

      3.     <u>Specific Jurisdiction</u>

Without in any way limiting the scope of the Bankruptcy Court's retention of jurisdiction over the Chapter 11 Cases as otherwise set forth in the Plan, subject to the jurisdictional provisions of the FCA Settlement and the SBA Settlement, the Bankruptcy Court will retain jurisdiction for the following specific purposes:

      a.     To hear and determine any applications or motions pending on the Effective Date for the rejection, assumption or assumption and assignment of any executory contract and to hear and determine, if need be, the allowance of Claims resulting therefrom;

      b.     To hear and determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

      c.     To ensure that distributions to Holders of Allowed Claims are accomplished as provided under the Plan;

      d.     To hear and determine objections to Claims, including ruling on any motion filed pursuant to Article VII of the Plan;

      e.     To allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Interests;

      f.     To enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

      g.     To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

      h.     To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

i. To hear and determine any and all applications for allowance of compensation and reimbursement of expenses and the reasonableness of any fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

j. To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated thereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

k. To take any action and issue such orders as may be necessary to construe, enforce, implement, execute and consummate the Plan or maintain the integrity of the Plan following consummation of the Plan;

l. To hear and determine other matters and for such other purposes as may be provided in the Confirmation Order;

m. To hear and determine all matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code filed, or to be filed, with respect to tax returns for any and all applicable periods);

n. To issue such orders in aid of execution of the Plan as may be authorized by section 1142 of the Bankruptcy Code;

o. To adjudicate all claims or controversies to a security or ownership interest in the Debtors' respective Assets or in any proceeds thereof;

p. To resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article X of the Plan and to enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

q. To consider and act on the compromise and settlement of any Claim against or Cause of Action by or against the Debtors arising under or in connection with the Plan;

r. To determine such other matters or proceedings as may be provided for under the Bankruptcy Code, the Bankruptcy Rules, other applicable law, the Plan or in any order or orders of the Bankruptcy Court, including but not limited to the Confirmation Order or any order which may arise in connection with the Plan or the Confirmation Order;

s. To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code;

t. To recover all Assets of the Debtors and property of the Debtors' Estates, wherever located; and

u.      To enter a Final Decree closing the Chapter 11 Cases.

4.      Failure of Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, declines to exercise, or is otherwise without jurisdiction over any matter arising out of the Chapter 11 Cases, including the matters set forth in Article XI of the Plan, then Article XI of the Plan will not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## VI. CONFIRMATION OF THE PLAN

### A.      Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court, after appropriate notice, hold a hearing on confirmation of a plan of reorganization (the "Confirmation Hearing").  The Bankruptcy Court has established the date and time of the Confirmation Hearing as November 3, 2010 at 2:00 p.m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned or continued from time to time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned or continued date made at the Confirmation Hearing or any subsequently adjourned or continued Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization.  Objections to Confirmation of the Plan must be filed and served on or before October 25, 2010 at 5:00 p.m. (prevailing Eastern Time) in accordance with the notice accompanying this Disclosure Statement.

> **UNLESS OBJECTIONS TO CONFIRMATION OF THE PLAN ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE ORDER APPROVING THE DISCLOSURE STATEMENT, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### B.      Statutory Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied.  If so, the Bankruptcy Court will enter the Confirmation Order.  The Debtors believe that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtors, as the proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any plan payment made or to be made by the Debtors under the Plan for services or for costs and expenses in, or in connection with the Chapter 11 Cases, has been approved by, or is subject to approval of, the Bankruptcy Court as reasonable;

- The Debtors have disclosed the identities and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, manager, officer or voting trustee of the Reorganized Debtors, or a successor to the Debtors under the Plan. The appointment to, or continuance in, such office by such individual is consistent with the interests of Creditors and Interest Holders and with public policy and the Debtors as the proponents of the Plan have disclosed the identity of any insider that the Reorganized Debtors will employ or retain, and the nature of the compensation for such insider;

- With respect to each Class of Impaired Claims or Interests, either each Holder of a Claim or an Interest in such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of such Claim, the Plan provides that Allowed Administrative Claims and Allowed Priority Non-Tax Claims will be paid in full (i) on the Effective Date or as soon thereafter as practicable, or (ii) on the date on which such Claim would have been due and payable if the Chapter 11 Cases had not been commenced;

- Except to the extent that the Holder of a particular Allowed Priority Tax Claim agrees to a different treatment, the Plan provides that Allowed Priority Tax Claims will be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code;

- At least one Class of Impaired Claims not including any acceptance of the Plan by any Insider (as defined in section 101(31) of the Bankruptcy Code) holding a Claim in such Class will have accepted the Plan;

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors under the Bankruptcy Code, unless such liquidation or reorganization is proposed in the Plan; and

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee will be paid as of the Effective Date.

Set forth below is a summary of the relevant statutory confirmation requirements and an analysis of how the Plan satisfies these requirements.

1.      Feasibility

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the reorganized debtors. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared projections of the financial performance of the Reorganized Debtors for each of the three fiscal years from 2010 through 2013 (the "Financial Projections"). The Financial Projections and the assumptions on which they are based are set forth in the Projected Financial Information annexed hereto as **Exhibit 6**. Based on the Financial Projections, the Debtors believe that they will be able to make all payments required pursuant to the Plan while conducting ongoing business operations, and therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization.

The Financial Projections are based on assumptions that the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, that the Effective Date under the Plan will be October 1, 2010.

THE PROJECTIONS INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. THE PROJECTIONS WERE PREPARED IN JULY OF 2010. WHILE THE DEBTORS BELIEVE THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE PROJECTIONS.

The Debtors prepared the Financial Projections based upon certain assumptions that they believe to be reasonable under the circumstances. Those assumptions considered to be significant are described in **Exhibit 6**. The Financial Projections have not been examined or compiled by independent accountants. The Debtors make no representations as to the accuracy of the Financial Projections or their ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management, and are subject to significant incremental uncertainty as a result of the scope and potential duration of the current economic conditions both in the United States and abroad. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual financial results achieved during the three year period of the Financial Projections may vary from the projected results and the variations may be material. All Holders of Claims entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with the evaluation of the Plan.

2.      Best Interest of Creditors Test

Before the Plan may be confirmed, the Bankruptcy Code requires the Bankruptcy Court to determine that the Plan is in the "best interests" of all Holders of Claims and Interests in the

Debtors that are Impaired by the Plan and that have not accepted the Plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires the Bankruptcy Court to find either that (i) all members of an Impaired Class have accepted the Plan, or (ii) the Plan provides each member of a Class that has not accepted the Plan with property of a value, as of the Effective Date of the Plan, that is not less than the amount that such member would recover if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

In connection with the Committee's entry into, and the Bankruptcy Court's ultimate approval of, the Challenge Action Settlement Agreement, the Committee, with the assistance of its legal and financial advisors, analyzed the likely recovery for Holders of Allowed General Unsecured Claims through the prosecution of the Challenge Action and determined that Creditors were receiving a greater recovery under the Challenge Action Settlement Agreement than the recovery that would likely result from a successful prosecution of the Challenge Action. Indeed, the Committee concluded that the Challenge Action might not be resolved in favor of the Debtors' Estates and there was no assurance that the resolution of the Challenge Action would generate the funds necessary to make a significant distribution to Holders of Allowed General Unsecured Claims. Moreover, an overriding concern of the Committee with respect to the Challenge Action had been that even if the Committee was completely successful in prosecuting the Challenge Action, the Committee would still need to address the deficiency claim asserted by the Administrative Agent on behalf of the Prepetition Secured Lender, which had the potential to swamp the other General Unsecured Claims of the Debtors' Estates and result in the prospect of the Prepetition Secured Lender being the largest beneficiary of the Challenge Action absent the Committee's ability to equitably subordinate, recharacterize or disallow the Prepetition Secured Lender's deficiency claim. Thus, even to the extent that the Challenge Action was successfully litigated and resulted in the avoidance of the Administrative Agent's liens and security interests in certain of the Prepetition Collateral, the Committee believed that approximately eighty-five (85%) percent of the recoveries would inure to the benefit of the Prepetition Secured Lender by virtue of its deficiency claim.

Based on the Committee's analysis in connection with the Challenge Action, the Debtors believe that Holders of Claims and Interests in the Debtors will receive equal or greater value as of the Effective Date than such Holders would receive in a liquidation under chapter 7 of the Bankruptcy Code and that the Plan will therefore meet the "best interests" test provided in section 1129(a)(7) of the Bankruptcy Code.

3.      Acceptance by Impaired Classes of Claims and Interests in the Debtors

As a condition to confirmation of the Plan, the Bankruptcy Code requires that each Class of Impaired Claims and Interests in the Debtors vote to accept the Plan, except under certain circumstances. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of Impaired Claims as acceptance by Holders of at least two-thirds in dollar amounts and more than one-half in number of Claims in that Class, but for that purpose counts only those who actually vote to accept or reject the Plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in dollar amounts and a majority in number actually voting cast their Ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a Class of Interests in the Debtors has accepted the Plan if Holders of such Interests holding at least two-

thirds in amount actually voting have voted to accept the Plan. Holders of Claims or Interests in the Debtors who fail to vote are not counted as either accepting or rejecting the Plan.

Classes 2, 3, 4, 5, 6, and 7 are Impaired under the Plan and are entitled to vote to accept or reject the Plan. Class 1 is Unimpaired under the Plan and, therefore, is conclusively presumed to have voted to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Classes 8 and 9 are Impaired under the Plan and are neither receiving nor retaining any property under the Plan, and thus are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

Because Classes 8 and 9 are deemed to have rejected the Plan, the Debtors are required to satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 8 and 9. It is also possible that one or more of the other Classes will reject the Plan.

4. Satisfaction of Confirmation Requirements With Respect to Non-Accepting Classes

Section 1129(b) of the Bankruptcy Code provides a mechanism for confirmation of a plan in circumstances, which mechanism is commonly referred to as "cram down," where the plan is not accepted by all impaired classes of claims and equity security interests. Under section 1129(b) of the Bankruptcy Court, the Court may "cram down" the Plan over the deemed rejection or actual rejection by an Impaired Class so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to such Classes.

(i) *No Unfair Discrimination*

This test applies to Classes of Claims or Interests in the Debtors that are of equal priority and are receiving different treatment under the Plan. A plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of the dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests. The test does not require the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors do not believe that the Plan discriminates unfairly against any of Classes 4, 5, 6 and 7 because the Plan provides substantially equivalent to treatment to these Classes whose legal rights are substantially similar and no Class will receive more than it legally is entitled to receive for its Claims. Classes 2, 3, 8 and 9 do not have similarly situated Classes and none of the Classes will receive more than it legally is entitled to receive for its Claims. Accordingly, the Debtors believe there can be no discrimination against any of Classes 2, 3, 8 and 9.

(ii) *Fair and Equitable Test*

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the

amount of allowed claims in such class.  As to the dissenting classes, this test sets different standards depending upon the type of claims or interests in such class:

a.      Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and for each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; (ii) for the sale of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale; or (iii) for the realization by such holders of the indubitable equivalent of such claims.

The Debtors believe that the Plan "is fair and equitable" with respect to Class 3 because the Holders of the Allowed Other Secured Claims are receiving the indubitable equivalent of such Claims.

b.      Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest.

The Debtors believe that the Plan is "fair and equitable" with respect to Classes 4, 5, 6, 7 and 8 (which Class of Allowed Subordinated Claims is deemed to have rejected the Plan) because no Class that is junior to Classes 4, 5, 6, 7 and 8 will receive or retain any property on account of the Claims or Interests in the Debtors in such Class.

c.      Interests

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of:  (A) the allowed amount of any fixed liquidation preference to which such holder is entitled; (B) any fixed redemption price to which such holder is entitled; or (C) the value of such interest, or (ii) if the class does not receive the amount as required under (i) hereof, no class of interests junior to the non-accepting class may receive a distribution under the plan.

The Debtors believe that the Plan will satisfy the "fair and equitable" treatment requirement notwithstanding that Class 9 (Allowed Interests) is deemed to reject the Plan

because no Class that is junior to Classes 9 will receive or retain any property on account of the Claims or Interests in the Debtors in such Class. Because at least one Class of Claims of General Unsecured Claims is not being paid in full, the Allowed Interests (as well as the Allowed Subordinated Claims in Class 8) are being extinguished.

## VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

> **NO RULING WILL BE SOUGHT FROM THE INTERNAL REVENUE SERVICE (THE "IRS"), AND NO OPINION OF COUNSEL HAS BEEN OR WILL BE SOUGHT, WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN. THE DISCUSSION SET FORTH BELOW IS FOR GENERAL INFORMATION ONLY AND DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THIS DESCRIPTION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS, AND EACH SUCH HOLDER IS URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

### A. Federal Income Tax Consequences of the Plan to the Debtors

The following is a general summary of certain significant U.S. federal income tax consequences of the Plan to the Debtors and the Holders of Claims and Interests. This summary is based upon the Internal Revenue Code of 1986 (as amended, the "Tax Code"), the Treasury Department regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and current administrative rulings and practice as in effect on the date hereof. These authorities are all subject to change at any time by legislative, judicial or administrative action, and such change may be applied retroactively in a manner that could adversely affect Holders of Claims or Interests and the Debtors.

Due to a lack of definitive judicial or administrative authority or interpretation, the complexity of the application of the Tax Code and Treasury Regulations to the implementation of the Plan, the possibility of changes in the law, the differences in the nature of various Claims and Interests and the potential for disputes as to legal and factual matters, the tax consequences discussed below are subject to substantial uncertainties.

1.    IRS Circular 230 Disclosure

> **TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, WE INFORM YOU THAT (A) ANY UNITED STATES FEDERAL TAX ADVICE CONTAINED HEREIN (INCLUDING ANY ATTACHMENTS OR DISCLOSURES) WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY PERSON OR ENTITY FOR THE PURPOSE OF AVOIDING UNITED STATES FEDERAL TAX PENALTIES, (B) ANY SUCH ADVICE WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN AND (C) ANY TAXPAYER TO WHOM THE TRANSACTIONS OR MATTERS ARE BEING PROMOTED, MARKETED OR RECOMMENDED SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

2.    Federal Income Tax Consequences to the Debtors

The Debtors will recognize cancellation of debt income to the extent of any debt forgiveness which will reduce the federal tax attributes of its operating loss carry-forwards and the tax bases of their Assets.

**B.    Federal Income Tax Consequences of the Plan to Holders of Claims and Interests**

> **THE FOLLOWING IS NOT INTENDED TO BE A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN FOR HOLDERS OF CLAIMS AND INTERESTS ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR AN INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OR HER OWN INDIVIDUAL TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER.**

A Holder of an Allowed Claim will generally recognize income to the extent that the amount of Cash or property received (or to be received) under the Plan is attributable to interest that accrued on the Claim but was not previously paid by the Debtor or included in income by the Holder of the Allowed Claim. A Holder of an Allowed Claim or Allowed Interest will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in the Claim or the Interest and the amount realized by the Holder upon consummation of the Plan that is not attributable to accrued but unpaid interest. The amount realized will be equal the sum of Cash and fair market value of other consideration received (or to be received).

The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the Holder, the nature of the Claim or Interest in its hands, whether the Claim was purchased at a discount, whether and to what extent the Creditor has previously claimed a bad debt reduction with respect to the Claim, and the Holder's holding period of the

Claim or Interest. If the Claim or Interest possessed by the Holder is a capital asset, the gain or loss realized will be generally characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the Holder is a non-corporate taxpayer and held such Claim or Interest for longer than one year or short-term capital gain or loss if the Holder held such Claim or Interest for less than one year.

A Holder of an Allowed Claim or Allowed Interest who receives, in respect of its Claim or Interest, an amount that is less than its tax basis in such Claim or Interest may be entitled to a bad debt deduction if either (i) the Holder is a corporation; or (ii) the Claim or Interest constituted (a) a debt created or acquired (as the case may be) in connection with a trade or business of the Holder or (b) a debt the loss from the worthlessness of which is incurred in the Holder's trade or business.

Holders of Claims or Interests who were not previously required to include any accrued but unpaid interest with respect to their gross income on a Claim or Interest may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. Holders previously required to include in their gross income any accrued but unpaid interest on a Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

Whether a Holder of Claims or Interests will recognize a loss, a deduction for worthless securities or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the Holder and its Claims or Interests. Accordingly, Holders of Claims and Interests should consult their own tax advisors.

The Debtors or the Reorganized Debtors, as applicable, will withhold distributions provided under the Plan and required by law to be withheld and will comply with all applicable reporting requirements of the Tax Code. Under the Tax Code, interest, dividends and other "reportable payments" may under certain circumstances be subject to "backup withholding." Backup withholding generally applies if the holder (i) fails to furnish his social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails to report interest or dividends, or (iv) under certain circumstances fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct TIN and the holder is not subject to backup withholding. Your Ballot contains a place to indicate your TIN.

If any party fails to provide the Debtors or the Reorganized Debtors, as applicable, with a requested TIN within sixty (60) days of that request, such failure will be deemed a waiver of rights to distributions under the Plan. Proceeds that would have been distributed to such a party will be distributed to the other parties based upon their pro rata beneficial interests.

## VIII. CERTAIN RISK FACTORS AND OTHER CONSIDERATIONS

### A. Failure to Receive Requisite Acceptances of the Plan

Classes 2, 3, 4, 5, 6, and 7 are the only Classes that are entitled to vote to accept or reject the Plan. If none of these Classes accept the Plan, the Debtors will not be able to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, because at least one Impaired Class will not have voted in favor of the Plan as required by section 1129(a)(10) of the

Bankruptcy Code. Further, if the Impaired Classes do not accept or cannot be deemed to have accepted the Plan, the Debtors may seek to accomplish any alternative restructuring of their capitalization and obligations to Creditors and obtain acceptances to an alternative plan of reorganization for the Debtors, or otherwise, that may not have the support of the Prepetition Secured Lender and/or may be required to liquidate their Estates under chapter 7 or 11 of the Bankruptcy Code. There can be no assurance that the terms of any alternative restructuring arrangement or a chapter 11 plan would be similar to or as favorable to Creditors as those proposed in the Plan.

**B.** **Failure to Confirm the Plan**

Even if the Impaired Classes accept or could be deemed to have accepted the Plan, the Plan may not be confirmed by the Bankruptcy Court, which, as a court of equity which may exercise substantial discretion, may decide not to confirm the Plan. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan of reorganization and requires, among other things, (a) that confirmation of the Plan not be followed by liquidation or a need for further financial reorganization of the Debtors, unless the Plan provides for such liquidation or a need for further financial reorganization, (b) that the value of distributions to dissenting Holders not be less than the value of distributions to such Holders if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, and (c) the Plan and the Debtors as the plan proponents otherwise comply with the applicable provisions of the Bankruptcy Code. Although the Debtors believe that the Plan will meet all applicable tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Additionally, the solicitation of votes from Impaired Creditors to accept the Plan must comply with section 1125 of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to the length of the solicitation period and the adequacy of the information contained in the Disclosure Statement. Although the Debtors believe that the solicitation of votes from Impaired Creditors to accept the Plan will comply with section 1125 of the Bankruptcy Code and the applicable Bankruptcy Rules, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**C.** **Failure to Consummate the Plan**

One condition to consummation of the Plan is the entry of the Confirmation Order that will approve, among other things, the assumption of a substantial number of the Debtors' executory contracts and unexpired leases and the execution of the financing documents in connection with the Restructured Credit Facility. In addition, in order to consummate the Plan, the Settlements will have been approved by the Bankruptcy Court in one or more Final Orders.

As of the date of this Disclosure Statement, there can be no assurances that these or the other conditions to consummation of the Plan will be satisfied or waived. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

**D.**     **Delays of Confirmation or the Effective Date**

Any delays of either Confirmation or the Effective Date of the Plan could result in, among other things, increased administrative costs, including Professional Fee Claims. These negative effects of delay of either Confirmation or the Effective Date could endanger the ability of the Debtors to consummate the Plan and emerge from bankruptcy protection.

**E.**     **Ability to Service Debt**

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have significant interest expense and principal repayment obligations. The Reorganized Debtors' ability to make payments on and to refinance their debt, including the obligations under the Restructured Credit Facility, and the Reorganized Debtors' other obligations, will depend on their future financial and operating performance and their ability to generate cash in the future. This, to a certain extent, is subject to general economic, business, financial, competitive, legislative, regulatory and other factors that are beyond the control of the Reorganized Debtors.

There can be no assurance that the Reorganized Debtors will be able to generate sufficient cash flow from operations or that sufficient future borrowings will be available to pay off the Reorganized Debtors' debt obligations, including, among other obligations, the payments required in connection with the Restructured Credit Facility. The Reorganized Debtors may need to refinance all or a portion of their debt on or before maturity; however, there can be no assurance that the Reorganized Debtors will be able to refinance any of their debt on commercially reasonable terms at all.

**F.**     **Forward Looking Statements in this Disclosure Statement May Prove to be Inaccurate**

Many of the statements included in this Disclosure Statement contain forward-looking statements and information relating to the Debtors. These forward-looking statements are generally identified by the use of terminology such as "may," "will," "could," "should," "potential," "continue," "expect," "intend," "plan," "estimate," "project," "forecast," "anticipate," "believe," or similar phrases or the negatives of such terms. These statements are based on the beliefs of management as well as assumptions made using information currently available to management. Such statements are subject to risks, uncertainties and assumptions, as well as other matters not yet known or not currently considered material by management. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those anticipated, estimated or projected. Given these risks and uncertainties, you are cautioned not to place undue reliance on such forward-looking statements. Forward-looking statements do not guarantee future performance. You should recognize these statements for what they are and not rely on them as facts. The Debtors do not undertake any obligation to update or revise any of these forward-looking statements to reflect new events or circumstances after the date of this Disclosure Statement.

# IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives include:

## A. Liquidation Under Chapter 7 of the Bankruptcy Code

The Debtors could be liquidated under chapter 7 of the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in lower distributions being made to Creditors than those provided for in the Plan because of: (i) the likelihood that the Assets of the Debtors would have to be sold or disposed of in a less orderly fashion, and (ii) additional administrative expenses attendant to the appointment of a chapter 7 trustee and the trustee's employment of attorneys and other professionals.

The Debtors, together with their advisors, have concluded that there would be substantial challenges to a sale of all or substantially all of the Debtors' Assets pursuant to section 363 of the Bankruptcy Code, and that such an approach would not likely increase the value of the recovery by the Debtors' stakeholders. Specifically, the Debtors believe that due to the size of the Prepetition Secured Lender Claim as compared to the value of the Debtors' Assets which secure the Claims of the Prepetition Secured Lenders, it would be improbable for the Debtors to attract buyers other than the Prepetition Secured Lender. Further, the Debtors believe that a purchase of their Assets by the Prepetition Secured Lender would likely be effected through a credit bid and would not bring any Cash into the Estates to provide any value to the Debtors' stakeholders.

## B. Alternative Plan(s) of Reorganization

The Debtors believe that the failure to confirm the Plan will lead inevitably to expensive and protracted Chapter 11 Cases. In formulating and developing the Plan, the Debtors have explored numerous alternatives and engaged in an extensive negotiating process with the Prepetition Secured Lenders and the Committee.

The Debtors believe that not only does the Plan fairly adjust the rights of various Classes of Claims, but also that the Plan provides superior recoveries to Classes 2, 3, 4, 5, 6 and 7 over any alternative capable of rational consideration (such as a chapter 7 liquidation), thus enabling many stakeholders to maximize their returns. Rejection of the Plan in favor of some alternative method of reconciling the Claims and Interests will require, at the very least, an extensive and time consuming process (including the possibility of protracted and costly litigation) and will not result in a better recovery for any Class of Claims or Interests in the Debtors.

> **BOTH THE DEBTORS AND THE COMMITTEE BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTIONS OF ANY RECOVERIES. THEREFORE, THE DEBTORS AND THE COMMITTEE RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

## C.      Dismissal of the Chapter 11 Cases

Dismissal of the Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the status quo ante. Upon dismissal of the Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time consuming process of negotiation with the Creditors, and possibly resulting in costly and protracted litigation in various jurisdictions. More significantly, dismissal of the Chapter 11 Cases may permit acceleration of the obligations under the Prepetition Credit Facility. Moreover, the Holder of the Class 2 Prepetition Secured Lender Claim may be permitted to foreclose upon the Assets that are subject to their Liens, which are all of the Debtors' Assets including Cash. Unless the Prepetition Collateral was demonstrated to be worth more than approximately $324 million (the amount of the Allowed Prepetition Secured Lender Claim), no other Creditors of the Debtors would likely receive any funds. Dismissal of the Chapter 11 Cases may also permit certain unpaid unsecured creditors to obtain and enforcement judgments against the Debtors. The Debtors believe these actions would destroy the Debtors' going concern value and could lead ultimately to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Therefore, the Debtors believe that dismissal of the Chapter 11 Cases is not a viable alternative to the Plan.

## X. CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives discussed herein because it will provide the greatest recovery to Creditors. Other alternatives would include significant delay, uncertainty and substantial administrative costs and are likely to reduce any return to Creditors. The Committee has reached the same conclusion and wholly supports the Plan. Both the Debtors and the Committee urge Holders of Impaired Claims in Classes 2, 3, 4, 5, 6 and 7 who are entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptances by returning their Ballots to the Voting Agent so that they will be received not later than 5:00 p.m. (prevailing Eastern Time) on October 25, 2010.

Dated: September 2, 2010

CIENA CAPITAL LLC f/k/a BUSINESS LOAN
EXPRESS, LLC, on behalf of itself and its affiliated
debtors and debtors-in-possession

By: */s/ Christina L. DelDonna*
        Name:  Christina L. DelDonna
        Title:    President and Chief Executive Officer